# Tarver *v.* Lindsey.

(Division B. October 26, 1931.)

[137 So. 93. No. 29530.]

**T. H. McElroy,** of Oxford, for appellant.

**Milton Williams,** of Memphis, Tenn., for appellee.

Argued orally by **T. H. McElroy**, for appellant.

**Griffith, J.,** delivered the opinion of the court.

On June 26, 1930, within the time allowed by law, appellant probated her claim against the estate of S. A. Eastep, deceased, for board and lodging from November 10, 1927, to October 31, 1929, at the rate of fifteen dollars per month amounting to the total of three hundred fifty-five dollars. The administrator admitted, after investigation on his part, that the claim was just and owing; but on November 15, 1930, Mrs. J. O. Barnes, one of the distributees in said estate, filed her protest and objections against the allowance of said claim or any part thereof, which objections upon a hearing by the chancellor were sustained, and the claim was disallowed.

The testimony, which is undisputed, shows that the deceased, Eastep, was a confederate veteran, and at the time of his death on October 31, 1929, was about eighty years old. He had never married, and with whom or how he had lived previously to the date next herein mentioned is not shown in the record, except for an inference to be drawn from a casual answer of one of the witnesses to the effect that a short time theretofore he had been living with a niece by the name of Brazier. He had no surviving brother or sister, and his nearest relatives

were nephews and nieces, living in widely separated communities, but apparently the claimant, who was a niece, lived in the same community where the deceased had resided.

The husband of claimant testified that on the 10th day of October, 1926, Mr. Eastep came to the home of claimant and stated to the said husband of claimant that he desired to come and live with claimant and her said husband, "if you don't charge too much board." The husband referred the matter to his wife, the **claimant, who** was then and there present, whereupon Mr. Eastep turned to her and asked her what she would charge him for board, and she replied in the form of the interrogatory, "Will fifteen dollars a month be too much?" to which Mr. Eastep responded that the amount mentioned would be agreeable to him. The witness Hill, the husband of one of Mr. Eastep's nieces, testified that some time about Christmas of said year 1926 he went with his wife to visit Mr. Eastep and finding him at claimant's residence, inquired of him whether he expected to make that his home, to which Mr. Eastep replied in the affirmative and added in explanation that he had made arrangements with Mrs. Tarver, the claimant, to live with her and to pay her fifteen dollars a month board. The testimony of these two witnesses is undisputed.

The testimony is undisputed also that, from the time Mr. Eastep came to claimant's home and made the contractual arrangement aforesaid, he remained there until his death; that during the entire time he was unable to work, moved about with the aid of a cane, was sometimes sick, was at nearly all times taking medicine, and was constantly visiting a physician, upon which visits claimant and her husband would accompany him. There is no suggestion in the record that claimant and her husband were not uniformly kind to the old man and considerate of all his wants. On the contrary, every inference to be drawn from the record bears out the affirmative of that inquiry; whereas the record is to the effect that none of

the others of his relatives were doing anything towards his care, save an occasional visit, and that, as to the objector in this case, she did not even do that.

The rule is well established in this state that claims for board or services furnished to a decedent must be established by clear and reasonably positive evidence and "that such claims and the evidence adduced to support them should be carefully scrutinized so as to prevent, as far as possible, the allowance of unjust or fictitious demands." 24 C. J., p. 404; Bell v. Oates, 97 Miss. 790, 53 So. 491; Hoyle v. Smith, 113 Miss. 729, 74 So. 611. But this does not mean that the solicitude for the integrity of decedents' estates shall be pushed to any such an extreme as that those who have reasonable and fairly well-substantiated claims of the nature here involved shall be treated with any less consideration before the courts than others who are required to apply there for the adjudication of their demands. Unjust and fictitious claims are to be rejected, certainly, and all claims of the nature here before the court must be cautiously examined, certainly; but we must not forget that, when a claim of this character, for the board of, and watching over, an old and physically dependent person, is a just claim, there is none other more just or meritorious.

We think the undisputed testimony of the two witnesses above mentioned is sufficient to establish an express contract to pay board at the rate of fifteen dollars per month, and certainly so when taken in connection with the circumstances hereinafter to be mentioned. The testimony of the said two witnesses has some direct corroboration in the testimony given by the circuit clerk of the county, who states that in the summer of 1929 Mr. Eastep said to him (said clerk) on an occasion when Mr. Eastep had bought a cold drink, that he (Eastep) would have to quit buying those drinks; that times were hard; that he could not draw his pension money; and that he did not see how he was going to pay his board. There is

here, at least, an acknowledgment of an obligation to pay board and an admission against any such theory as that he was residing with the claimant upon terms of gratuity.

But the said testimony of the circuit clerk, as above recited, has a further and an important bearing upon this case. There is the following presumption: When a person not a member of the immediate family—by which is meant, in this connection, those who have not in the ordinary course of the family life 'lived under the same roof—comes without special invitation to another person to board or to live, there is the presumption that, if the person so coming to live or to board is financially able, he will arrange to pay a reasonable board, and will make some agreement so to do. This has its foundation in' the presumption of honesty. The testimony now discloses that, when Mr. Eastep came, at his own invitation, to the home of claimant and arranged for board, he was, as he knew, then financially able to pay and to continue to pay the agreed amount. And thus the testimony that the contract was then made so to pay is strengthened and in this case made amply sufficient.

But upon like foundation there is also the presumption, in cases of claims for board and the like against the estate of a decedent, that the stipulated amount has been paid when due or reasonably near the due dates, if during all the while the decedent was well able to pay, and had on hand the current funds so to do. And it now turns out that deceased was able to pay, and was able at the time, in the summer of 1929, when he was telling the circuit clerk that because of hard times and the failure to draw his pension money he was afraid he could not pay his board; for, as the administrator has discovered, he had on deposit at that very time seven hundred dollars in bank, and, when he died soon thereafter, on October 31, there was found on his person cash in the sum of five hundred dollars and forty-five cents, and his

bank deposit was still intact; the bank account showing that he had not drawn a check upon it since March, 1926.

How does the case stand then on this presumption of payment? The testimony shows that some months before Mr. Eastep came to claimant's home to board he had loaned her one hundred forty-five dollars, and that later he had given to one of claimant's children a cow, and also that in the latter part of the year 1927 he had given to claimant a secondhand Ford automobile which Mr. Eastep had purchased for one hundred seventy-five dollars, and which was to enable claimant and her husband to carry Mr. Eastep on his visits to his physician. Beyond the loan and gifts aforesaid, the testimony is that nothing was received from Mr. Eastep on his board. The one hundred forty-five dollars, and evidently the cow also, though no value was given in the evidence respecting the cow, were credited on the first year's board, so that the probated claim began with November 10, 1927, instead of November 10, 1926. No credit, however, was given for the Ford car, which we think, and now state, should be credited, because, although claimant may have honestly supposed from remarks made by deceased that the car was an outright gift to her, there is not enough to show but that it was the purpose of the deceased that the car was to be taken as a credit on his said board bill, and the latter view is the more agreeable with the salient characteristics which mark this record.

No demand was made of Mr. Eastep by claimant for the payment of his board beginning with the second year, nor at any time thereafter, and the claim was not probated until June 26, 1930, although it must be added that notice to creditors had not been published until that same day. The testimony shows that neither the claimant nor her said husband knew, during the last two years of his life, of any property or money belonging to Mr. Eastep other than some loans upon which he was drawing interest, plus his pension money, payment upon which

had been stopped some time before his death; this latter fact being disclosed, not only by the statements of deceased, but also by the reports of the administrator to the effect that the administrator collected some two hundred ten dollars of back-due pension money. The report of the administrator discloses also the existence of the outstanding loans, which turned out, however, to be small. The husband of claimant stated that they knew of no other property owned by deceased; that he knew that deceased, at some time prior to the first date of the ·claim here propounded, had owned some small real property interests, but that his information was that all this had been sold and that the proceeds had gone into the loans mentioned upon which deceased was drawing an occasional payment of interest; that the impression conveyed to claimant and her said husband by deceased was that the money coming into the hands of deceased from these loans, and after the payments on the pension money had been stopped, was all that he had available, and this was not more than sufficient to pay for medicines and physician's services and for the needs of deceased, other than his board; and that, out of delicacy for that situation, claimant did not make or press any demands on him for said board, during the last two years.

That claimant and her husband did not know of any money in bank is demonstrated, we think, by the circumstances that, when the said husband went to Oxford to deposit the balance of the money, found on the person of the deceased at the time of his death, less that which was paid for funeral expenses, the money was deposited in a different bank, which certainly would not have so happened had they known of the deposits and deposit account already existing in another bank in the same town. And just here is to be mentioned an important consideration as confirmatory of the fidelity and honesty of this claimant and her husband. Nobody except them, so far as this record discloses or gives any

intimation or ground for suggestion, knew that, when the deceased died, there was discovered on his person the sum of five hundred dollars and forty-five cents. If they had any purpose, or were of the characters, to filch from the estate, or act dishonestly in regard to it, they could have kept the entire five hundred dollars and forty-five cents, said nothing about it, and none would ever have known of it.

It might be argued, in the connection last mentioned, that, if this board bill was actually owing, the claimant and her husband, after the paying of the funeral expenses out of this money, would have kept the balance to apply on said bill; and, although disclosing to others the finding of said money on the person of deceased at his death, they would have justified the retention of the balance for the board bill debt; and that, not having done so, there was no board bill due. While it may be admitted as true that some persons would have taken the course suggested, we must deny that the average person, entertaining an average sense of delicacy or honor, would have done other than was done by claimant and her husband here, and for reasons obvious to the mind and feeling of the average normal person, which reasons do not need elaboration here at our hands.

We are thus brought to the point where we may return to the testimony of the circuit clerk which we have said has an important bearing on this case. It confirms not only that the deceased recognized an obligation to pay board, but confirms the testimony of claimant's husband that deceased was not actually paying to the full amount due and when due, because he was giving out the impression that he was not then able to do so, not only to claimant and her husband, but also to others. He told the circuit clerk that he would have to quit buying soft drinks costing five cents each because his pension money had been held back on him and that he could not pay his board. It was true that his pension payments

had been held up, but at the same time it was also true that he had at that very time more than one thousand two hundred dollars cash on hand.

Those who have long judicial experience, as well as many others who have closely observed the actual facts of life, have noticed two different peculiarities in some of the old and physically dependent persons who, being without homes of their own and being under the necessity of living with strangers or with those not of their immediate family, have thereby come under the dread of losing the aid of younger hands and the interest of younger hearts. It is sometimes found in such cases that the aged person observed will conceive himself to be the owner of a large estate, and will make sundry suggestions in respect to the bounties which will be found in his last will and testament in favor of those who will continue to befriend and minister to him in his last days; while another such person so observed will take an opposite course, will hoard and hold onto every penny he possesses, and will at the same time exert seductive and cautious efforts to convey the impression that he is practically without presently available means, so that, if those with whom he is presently located continue kind to him and, as well, take care of his physical wants, he will be safe in his lifetime and upon his death those to whom he is thus indebted will be safe in that they will find in his estate the means to repay them, thus ultimately fulfilling in substantial effect the requirements of honesty, whereas if that kindness ceases, he will still be safe in that he can go elsewhere and will have the reserved means actually on hand with which to do so.

This record demonstrates, as we think, that we have here a case of the latter kind and that the adjudication of the issue should be placed upon that view. We have written at length, because the finding of the chancellor upon the facts was adverse to the claimant, and the rule is that the finding of the chancellor on the facts must

stand unless manifestly wrong, and this includes the reasonable inferences that may be drawn by the chancellor, as the trier of the facts. But we think the chancellor must have been influenced, as a matter of law, by some of the rather broad expressions found in some of our decisions, which, if disassociated from the facts of the cases in hand, would seem almost to outlaw claims of this character; whereas the real meaning of those expressions is to be interpreted as we have hereinabove stated. Moreover, the salient and controlling facts in this case are undisputed, and they are stronger for the claimant than were those in Loviza v. Lynch, 115 Miss. 694, 76 So. 629, wherein there was a reversal. See, also, Gaulden v. Ramsey, 123 Miss. 1, 85 So. 109. Where, as in this case, the testimony of intelligent witnesses is undisputed, is reasonable in itself, and is in reasonable harmony with the physical facts and the facts of common observation among experienced persons, and the witnesses are unimpeached, then the trier of the facts must act on the testimony and cannot reject it, else trials might eventuate in arbitrary results, rather than in the product of judicial determination. It is better that courts may be sometimes wrong, may sometimes fail to find justice, than at any time they shall act arbitrarily, or be bound by anything other than the record of the case as it is made out in court.

The decree will be reversed, and a decree will be entered here in favor of appellant for the amount of her claim, less credit for the Ford car, that is, a decree will be entered here for a balance of one hundred eighty dollars; the costs of this appeal to be taxed against the objector, Mrs. J. O. Barnes, said costs to be paid by the administrator out of her distributive share in said estate, the receipt of the clerk to become the voucher therefor.

Reversed, and decree here.