STEPHENS *v.* DUCKWORTH *et al.*

(Division B. May 13, 1940.)

[196 So. 219. No. 34148.]

Jones & Ray, Lotterhos & Travis, and **Vardaman S. Dunn,** all of Jackson, for appellant.

James **B. Sykes**, of Mendenhall, and **H. W. Hobbs**, of Jackson, for appellees.

**McGowen, J.**, delivered the opinion of the court.

On June 16, 1938, W. J. Tullos died intestate, and his son, John R. Tullos, was appointed administrator of his estate. His daughter, Mrs. Sallie Stephens, filed her petition in the Chancery Court, alleging that for a period of about eight years, from March 27, 1930, she had been induced by her father to leave her own home, and remove, with her four minor children, to his home in order to take care of him and his place, consisting of 40 acres; promising that he would give her the home place at his death. In her petition she set up that there was an express contract, not an implied one, which had been breached by her father, in that he made no sort of conveyance to her of this real property together with certain personal property on the place.

The administrator filed an answer, in which he admitted that the deceased made the promise alleged in the

petition. A number of heirs-at-law of the deceased were permitted by the court to intervene and file an answer; and they sharply denied that there had been any sort of contract between the deceased and Mrs. Stephens. In their answer they plead the statute of limitation of three years, and that the claim propounded by Mrs. Stephens in her petition had not been probated.

By agreement of the parties R. G. Livingston was appointed special master by the court, and was fully invested with all the powers conferred by law, with instructions to report his finding of facts involved in the proceedings to the court. The master heard the evidence and filed his report in the Chancery Court. Mrs. Duckworth and the other heirs-at-law filed their exceptions, which were overruled by the master, he having found that the contract to render services had been entered into by the decedent and Mrs. Stephens in his lifetime, and that she was entitled on quantum meruit to receive $20 per month for 95 months, as reasonable compensation for services performed by her, aggregating a total value of $1,900. He further reported, as a matter of law, that the amount of recovery sought was not a provable claim; that the contract was a continuous one, and that, therefore, the statute of limitations did not apply.

Upon the filing of the report the appellees, the contesting heirs-at-law, filed exceptions thereto, which were overruled by the master. The Chancellor, upon hearing the report of the master, and the exceptions, reversed each finding of the master, both upon points of law, and upon the facts. The Chancellor held that no contract was entered into between the parties; that the recovery sought was a claim against the estate which had not been probated, and that the master did not have before him any proof of the value of the services rendered by Mrs. Stephens to the decedent in his life-time.

W. J. Tullos was an old man, unable to read or write. About three weeks before this contract was entered into with his daughter his wife became ill, and he sent for

Mrs. Stephens to come and nurse her mother. She was employed as a laundry checker in the Sanatorium laundry at Magee, at a salary of $40 a month; upon receiving her father's message she gave up the place, nursed her mother until she died, and then did not return to her former work. In a few days John Tullos, the administrator, advised his father to have Mrs. Stephens move to his home, to take care of him and the place. This suggestion met with the approval of decedent, and he sent his son to interview Mrs. Stephens, who declined to give up her home and move to her father's home. Thereafter the decedent sent Will Jones, his long-time friend and business adviser, with John Tullos to see Mrs. Stephens, telling them to say to her that if she would move into his home with her children, and take care of him and his place, he would give her the home place and everything on it. They delivered the message, and she reluctantly accepted and promptly moved to her father's home, where she remained until his death. This was testified to in great detail both by the friend, Will Jones, and by John Tullos, brother of the appellant. There was considerable evidence to the effect that throughout the years his daughter lived with him the decedent expressed his intention of leaving the home place to her with all the property on it, and indicated his satisfaction with her services. The evidence before the master showed that she did all the work of a housewife; that her father had on his back cancerous sores about the size of a dollar, which she regularly treated, bathing and applying medicine; that she served as his barber; that with the help of her children she raised a garden, worked in the field, ploughed, hoed, fed sixteen head of live stock, milked a number of cows; and that her children also worked. The oldest daughter married within a year or two, and moved away. When the oldest son was grown the grandfather refused to allow him 50 cents a week for spending money, whereupon he left. The record shows that at times the decedent bought staple groceries, such as flour

and lard; but that Mrs. Stephens, by canning the products of the garden, attending to the poultry, and selling garden produce, bought much of the food consumed by the entire family, as well as delicacies for her father. This service was continued throughout the period spent in her father's home, though on occasions her father took her to Magee for the day, that she might work and earn some money. In all the eight years that she lived with him, he is not shown to have contributed more than $20 to her during the entire eight years, her brother John Tullos, having provided her with such sums of money as she needed for extraordinary expenses.

Other witnesses testified to frequent declarations on the part of the decedent to the effect that Mrs. Stephens had been good to him, and that he intended for her to have the home place. On his death bed he called upon Will Jones and John Tullos to see that she got it.

Some of the contestants testified that some six or eight months before his death the decedent stated to them that he intended to have his property divided equally between them. Some contradictory statements were introduced, attributed to the witness, John Tullos, and two or three of the contestants testified that Jones' reputation for veracity was bad.

The entire record shows that the decedent was an exacting, economical man. And that because of his inability to read and write, he relied upon his daughter to keep his books in connection with the three hundred acres of land which he owned, and his tenants thereon, whom he furnished.

As to the facts of the case, we think the contract was established by competent evidence, which the master, who saw the witnesses and heard them testify, believed, and which is not substantially contradicted in this record. In our opinion the master correctly found that the parties had entered into a mutual contract, by which the decedent expected to compensate Mrs. Stephens, and she rendered faithful service, expecting to receive com-

pensation therefor. Of course, the oral contract to convey to her the home place cannot be enforced under the laws of this state; and therefore she is entitled to compensation for the fair value of her services, rendered to this decedent at his request, for which he expected to reward her at his death. The circumstances show that neither of the parties expected her to receive this compensation until after his death.

We are impressed that the master was eminently correct in his finding of fact in regard to the existence of an express contract, mutually understood, at the time of the death of W. J. Tullos. The controlling principle was also announced in Tarver v. Lindsey, 161 Miss. 379, 137 So. 93; likewise in the case of Hickman v. Slough (Miss.), 193 So. 443.

We are not here confronted with a finding of fact by the Chancellor which cannot be reversed unless it shall appear to us to be manifestly wrong. But the Chancellor was not authorized to overturn the master's finding of fact, there being substantial evidence to uphold it. As we have said, there is little conflict, and no other finding could have been upheld.

In this state the report of a master has the same effect as the verdict of a jury, and must be approved if supported by substantial evidence. See Hines v. Imperial Naval Store Co., 101 Miss. 802, 58 So. 650; Daniel v. Klein, 149 Miss. 135, 115 So. 193. From the latter case we quote the following: ''We think there was ample evidence in the case to support the master's findings of fact. A master's findings of fact, when supported by the evidence, have the force and effect of the verdict of a jury on an issue of fact. Griffith's Chancery Practice, section 605; Hines v. Imperial Naval Store Co., 101 Miss. 802, 58 So. 650. Giving the master's findings of fact that weight, we do not think there was sufficient evidence to the contrary to justify the chancellor in overturning such findings of fact.''

It is shown both by the petition and the facts in this

case that Mrs. Stephens' claim against the estate of W. J. Tullos was an unliquidated claim, one which had to be determined by competent authority. Neither of the parties could have determined the amount which she was entitled to receive from the estate. Therefore, her claim propounded by her petition before the time for probation of claims, was not such as could be probated as required by section 1671, Code of 1930, as amended by chapter 304, Laws of 1934. Neither Mrs. Stephens nor the decedent in his life-time could have calculated the amount due her without some other agreement. It was a liability in the strictest sense of the word, and not a claim within the meaning of our statutes upon probated claims. For a discussion of the applicable reasons for so holding see Drainage Dist. of Noxubee County v. Evans, 136 Miss. 178, 99 So. 819; Dillard & Coffin Co. et al. v. Woollard, 124 Miss. 677, 87 So. 148; Boyd v. Applewhite, 121 Miss. 879, 84 So. 16; Feld v. Borodofski, 87 Miss. 727, 40 So. 816; and Harris et al. v. Hutcheson, 65 Miss. 9, 3 So. 34, and the cases therein cited.

It is not even contended here in appellee's brief that this was not a continuing claim for services, and therefore not barred by the Statute of Limitations. See Ellis v. Berry, 145 Miss. 652, 110 So. 211; Carter v. Witherspoon, 156 Miss. 597, 126 So. 388; Gaulden v. Ramsey, 123 Miss. 1, 85 So. 109; Lee v. Lee's Estate (Miss.), 191 So. 661; McCully v. McCully, 175 Miss. 876, 168 So. 608.

It is argued that no witness testified as to the value of Mrs. Stephens' services, and the Chancellor so held. No witness was offered to testify as to the value of her services, but the nature, extent and quality thereof was fully gone into. There are two answers to the contention—the first, that the appellees did not by exception point out this alleged defect in the evidence to the master; second, as a sensible and experienced person, the master could determine the value of Mrs. Stephens' services, as well as could the witnesses; and that this is the character of case where knowledge of the value of the services comes

within the experience of all sensible persons; and if the master's report is to be accorded the weight of the verdict of a jury, we would not say that a jury was not competent to estimate the value thereof, having before it the nature and extent of the services rendered by Mrs. Stephens. See First National Bank v. Owen, 177 Miss. 339, 171 So. 4; Hickman v. Slough (Miss.), 193 So. 443; 71 C. J., Work & Labor, section 121.

It is our conclusion from the foregoing that the master's report should be reinstated, the decree of the Chancery Court should be reversed, and decree rendered here in favor of the petitioner in the amount found by the master to be reasonably due the appellant, Mrs. Stephens.

Reversed and decree here for appellant.