JAMES et al. *v*. TAX INVESTMENT Co. et al.

In Banc. May 9, 1949.

(40 So. (2d) 539)

**Smith & Jones**, for appellants.

W. W. Simmons, and A. D. Somerville, for appellees.

610

**Hall, J.**

Appellants brought suit in chancery seeking cancellation of a tax deed to Tax Investment Company, a deed from that company to Elisha Shaffer, and a deed of trust from Elisha Shaffer to Tax Investment Company, and from a decree dismissing their bill and denying the relief sought they have appealed to this court.

The suit involves one lot in the City of Cleveland upon which a dwelling house is situated. The bill deraigns title from the United States down to the appellants and alleges a tax sale by the Sheriff and Tax Collector of Bolivar County to Tax Investment Company on April 3, 1944, for 1943 ad valorem taxes, and a further tax sale on April 2, 1945, to Sam Hyman for 1944 taxes. The bill charges that Hattie James went to the office of the Sheriff and Tax Collector of said county in April, 1945, and stated to a deputy that she desired to pay the taxes on said lot, and the deputy advised her that the lot had sold for taxes and that she would have to go to the office of the Chancery Clerk to redeem it, and that she thereupon did go to the Chancery Clerk's Office and requested that she be permitted to pay the back taxes on the property and she was requested to return on a subsequent date, which she did, with the result that on April 16, 1945, she was advised that the amount necessary to redeem the property was $16.34, which amount she then paid; that she had upon her person sufficient money with which to pay all taxes and redeem said property from all tax sales theretofore made, and that she was ready, willing and anxious so to do, and that she did everything possible on her part to effect a redemption thereof from said tax sales; that

these efforts on her part were sufficient to effect such redemption and took away from the taxing authorities the power to convey the title to said lot under the first tax sale.

The bill charged that on April 9, 1946, the Chancery Clerk executed a tax deed for said lot to Tax Investment Company pursuant to the tax sale of April 3, 1944, that on April 26, 1946, said company executed a deed therefor to Elisha Shaffer and took a deed of trust back from him securing an indebtedness of $1350.00, and it charged that these conveyances are void and should be cancelled.

The appellees answered the bill and admitted the deraignment of title, the tax sales, and the deeds and deed of trust above mentioned, but denied that Hattie James sought to redeem the lot from any tax sale except the one held on April 2, 1945, for the 1944 taxes, and charged in this connection that Hattie James was quite indignant and impertinent to the clerk because the property had sold the one time, and that no word was said about any previous sales.

A majority of the Court is of the opinion that the decree of the Chancellor is so manifestly erroneous that the same should not be permitted to stand, and, therefore, we shall detail at some length the picture disclosed by the evidence.

Will and Hattie James are Negroes and are husband and wife. He went to the fourth grade in school and she went to the fifth grade. The property in question is the first and only home they ever owned. They bought it on credit, but had just completed paying it out of debt at about the time of the first tax sale. They had a son who was in the army and in 1943 they rented out their home and went temporarily to Chicago so that they could be near their son who was then stationed at that place. Will and Hattie both obtained gainful employment in Chicago and remained in this employment after their son went overseas because they were making more money than they could make in Cleveland, Mississippi.

Hattie left Chicago and came to Cleveland, arriving there on Friday, March 30, 1945. On the following Monday which was April 2 she went to the office of the Sheriff and Tax Collector of Bolivar County at about 1 P. M. and made inquiry of a deputy about the taxes on this property, and the deputy told her that it had sold for taxes and requested her to return later. She did return on or about April 7th, and the deputy told her to go to the Chancery Clerk's office. On or about the following Tuesday, which was April 10, 1945, she went to the Chancery Clerk's office and asked one of the deputies if she could pay Will and Hattie James' taxes and this deputy looked at some records and told her she did not have the record of it and requested her to return on the following Saturday. She returned to the Chancery Clerk's office on the following Monday and again made known to the deputy that she desired to pay Will and Hattie James' taxes and the deputy told her she did not have a record of it.

Having thus made two trips to the Sheriff and Tax Collector's office and two trips to the Chancery Clerk's office, and having made no progress whatever toward settling the taxes, Hattie then went on Sunday, April 15, to see Mrs. Elizabeth Shands, wife of a prominent attorney at law in Cleveland, for whom she had worked for a period of nine years before going to Chicago, and sought the assistance of Mrs. Shands in inducing the officials of the county to let her pay what she owed so that she could return to Chicago. Mrs. Shands told Hattie that she had a friend in the Chancery Clerk's office and that she would telephone this friend and make the request that they permit Hattie to pay what she owed. Mrs. Shands did telephone one of the deputies on the next day and made this request, and Hattie returned to the Chancery Clerk's office on April 16, and saw this deputy and told her that she wanted to pay all of Will and Hattie James' taxes, and this deputy walked out of the room and came back with a piece of paper and told her that the amount was sixteen dollars and some cents, and Hattie

then told the deputy that she wanted to pay it in full, and the deputy told her that this was the correct amount, so she paid it, and was handed an instrument which released the property only from the tax sale of April 2, 1945, for 1944 taxes. This instrument was introduced in evidence.

Hattie was not satisfied with the amount she had paid, being afraid that there was something more still due, and she accordingly went back to the home of Mrs. Shands, and told Mrs. Shands that she was afraid she had not paid enough, and thereupon Mrs. Shands telephoned the Chancery Clerk's office and reported this to the deputy, and, quoting the testimony of Mrs. Shands, "the response was that she had paid the amount that the tax roll called for, or some words to that effect. . . .

"Q. And substantially what information did you elicit from that? A. Well, it thoroughly satisfied me with the answer that she had paid all she owed.

"Q. Paid all she owed; whatever the words were that was the meaning that you got out of it? A. Yes, sir.

"Q. Then did you have any further talk with Hattie James? A. I just told her she might as well go on home if she was ready; that this was taken care of. That is the way I understood it. . . .

"Q. As to the words used by Mrs. Tatum you would not say? A. Well, I couldn't give it verbatim; it has been too long ago. Whatever she said satisfied me that Hattie did not owe anything else."

The testimony shows without dispute that Hattie James had $375.00 in cash with her when she arrived in Cleveland; that she expended $135.00 in having the house painted, and took out a five year insurance policy on the house, paying $35.00 therefor, and that she had approximately $200.00 in cash upon her person when she undertook to redeem her property from the tax sales. Hattie testified that she was trying to pay "everything that was against the house, I was willing and ready to pay that, and asked to pay it." ,

It was shown without dispute that the house was rented to Elisha Shaffer and he paid rent regularly to Will and Hattie James until after maturity of the first tax sale, and remained in possession of the property after purchasing it from Tax Investment Company. It was also shown without dispute that neither Will nor Hattie James ever received any notice of the first tax sale, though such a notice was issued by the clerk for Will James and placed with the sheriff and returned with a notation that he could not be found in the county.

The deputy clerk, Mrs. Tatum, testified for appellees on direct examination. "Q. Do you remember when she came to your office in 1945 in reference to some taxes? A. Yes, sir. Q. What did she say when she came in there, Mrs. Tatum? A. Well, she said, as best I remember—I don't remember exactly what she said—she said she came in to pay some taxes." After this preliminary admission of lack of memory, Mrs. Tatum testified positively on direct examination that Hattie said she wanted to pay the 1944 taxes and that she said nothing about paying any other taxes and made no request that the records be checked for any prior tax sale. If the testimony of this witness had stopped at this point we might be inclined to feel that there was something on which to uphold the decree of the lower court, but on cross-examination this witness said that she has a custom of looking back for other tax sales when requested to do so, and that since she did not look back for the record of the sale in 1944 she assumes that she was not asked to do so; she also said that "I waited on her,—I talked with her the first time—I don't know whether I talked with her the second time—I helped in the transaction—I know my notation is on the back, but whether or not I actually talked to her the second time, I am not sure. . . .

"Q. You don't remember what Hattie James said when she came in? A. What do you mean, what she said about what?

"Q. About her taxes? A. Well, she said she came to pay her taxes, I assume she let it be known that she came to pay her taxes.

"Q. And you assumed from that that she came to pay the 1944 taxes? A. She didn't say she came to pay any particular years."

Mrs. Tatum admitted the first telephone conversation with Mrs. Shands, and did not deny the second one but said she had no recollection of it.

As indicative of the attitude of Mrs. Tatum toward Hattie James, she was asked whether she took offense at her attitude or her bearing or something, and she said "I didn't take any personal offense at her. I just didn't care to wait on her the second time." She also said it was Hattie's bearing that offended her, but she was unable to point out anything that caused the offense. It was shown by the testimony that on her last telephone call to the clerk's office, Mrs. Shands was advised that Hattie had been offensive in some way, and she reported this to Hattie. It is also shown without dispute that upon her return to Chicago Hattie wrote a letter of apology to the deputies who had waited on her and told them in effect that if she had done or said anything that gave them offense that she was sorry and wanted forgiveness.

The other deputy clerk, Mrs. Wiggins, testified for appellees that she has no recollection whatever about any conversation with Hattie, but that the usual custom in the clerk's office was to look back for prior tax sales if requested to do so.

This is not a case where a party claims to have attempted to pay taxes or to redeem from a tax sale without corroborating proof. Here we have the testimony of a prominent white matron, who had no interest whatever in the matter and whose veracity is unquestioned, which supports the testimony of Hattie to the effect that she was making an effort to pay everything that she owed, and, in the light of this, we do not feel that the indefinite and uncertain testimony of the two deputies, who for

some undisclosed reason took offense at Hattie's attitude or bearing, is sufficient to support the decree in this case. Nor are we impressed with the argument so ably stressed by appellees that Hattie only requested to be permitted to pay 'her taxes and did not specifically request a redemption from the tax sales. Hardly anyone but a lawyer or a well-educated business man would know the technical difference between the two expressions, and we doubt not that this illiterate and uneducated Negro woman, with no business experience, would any more understand the meaning of a tax redemption as distinguished from the payment of taxes than she could explain Einstein's theory of relativity.

It is argued that Hattie admitted in her testimony that she had sent the money to one Cleo Woods with which to pay her taxes for one or more of the prior years and that she thought that the 1943 taxes had been paid, but this does not alter the fact that the evidence in her behalf shows that she did everything within her power to pay everything that she owed on this land and that the appellees produced no substantial proof to contradict this. On this very same trip from Chicago to Cleveland she had the house painted and took out an insurance policy on it, and all of this is wholly inconsistent with the idea that she wanted to redeem the property only from the sale for 1944 taxes.

This case is no different in principal from McClain v. Meletio, 166 Miss 1, 147 So. 878; Kelly v. Coker, 197 Miss. 131, 19 So (2d) 519; Beauchamp v. McLauchlin, 200 Miss. 83, 25 So. (2d) 771; McNatt v. Hyman, Miss. 38 So. (2d) 107, not yet reported in State Reports; and Brannon v. Lyon, 86 Miss. 401, 38 So. 609. ██ █ In those cases it was held that statutes allowing land to be redeemed from tax sales are to be liberally construed in favor of the person seeking to redeem, and that an owner's offer to redeem from any and all tax sales within the redemption period, with sufficient money upon his person with which to effect such redemption, includes every form of taxes

and takes away from the taxing authorities the power to convey title to any one else pursuant to tax sales from which no redemption had actually been accomplished by reason of neglect or otherwise of the custodian of the tax sale records.

It is true that in some of the cited cases there was no contradiction of the proof supporting the offer to redeem, ▇▇ but we hold that in the case at bar the proof in contradiction of the offer was so vague, indefinite, uncertain and unsubstantial that the same did not amount to a substantial conflict in the evidence sufficient to uphold the decree and that consequently the decree of the learned Chancellor is manifestly wrong and should be reversed.

Appellees rely principally on the cases of Little v. Gilmore-Puckett Lumber Co., Miss., 23 So. (2d) 918, not reported in the State Reports, and Pierce v. Ford, 199 Miss. 168, 24 So. (2d) 342, but we are of the opinion that neither of these cases is in point. In the Little case an application was made to the Chancery Clerk for a statement of the taxes due, but there was no evidence whatever as to the nature and extent of the inquiry and the land was redeemed from only a part of the unmatured tax sales, leaving one sale unredeemed; before maturity of that sale the statutory notice was given by registered mail to the applicant of the imminence of maturity of the sale and the applicant signed an acknowledgement of the receipt of such notice and then neglected to redeem the land. In the Pierce case the party who offered to redeem was not positive in his testimony as to the extent of the offer nor as to whom the purported offer was made; his attorney was present at the time and was not offered as a corroborating witness nor was there any other corroboration; the tax collector and his deputy both denied recollection of any such request and testified as to their unvarying custom of not advising that there was no tax sale without first examining the records, which examination would unquestionably have revealed the tax sale, and upon this they denied that there had been any offer to redeem. The

Chancellor held that there had been no redemption and this Court affirmed his decree. A mere statement shows that the two cases last mentioned are in nowise in point here. In neither case was the applicant corroborated by any other evidence. In both cases the testimony of the applicant as to an offer to redeem was vague, uncertain and indefinite, and in one of the cases the applicant actually received notice of the impending maturity of the tax sale and took no steps to redeem therefrom. Such is not the situation now presented.

It is also argued that Elisha Shaffer is an innocent purchaser for value without notice of any infirmities in his title. The record shows that when he purchased from Tax Investment Company he made a cash payment of $250.00 and gave a deed of trust to secure the remaining sum of $1350.00 due on the purchase price; he was a tenant of Will and Hattie James at the time. It is the settled law of this state that the purchaser of a tax title is not an innocent purchaser for value, but takes title subject to all its infirmities. McNatt v. Hyman, Miss., 38 So. (2d) 107, not yet reported in State Reports; Roebuck v. Bailey, 176 Miss. 234, 166 So. 358; Perret v. Borries, 78 Miss. 934, 30 So. 59; 51 Am. Jur., Taxation, Sec. 1061. Shaffer, therefore, cannot take refuge in his claim of innocent purchaser.

The decree of the court below is accordingly reversed and judgment here entered for appellants sustaining the prayer of their bill, but the cause is remanded for the sole purpose of an accounting by the lower court as to the amount necessary to be paid by appellants to redeem from the sale for 1943 taxes as well as the amount to be paid by them to reimburse appellees for the taxes, if any, which they have subsequently paid on the land in suit, for which, of course, the appellees shall have a lien as their interests may appear.

Reversed and decree here for appellants and remanded for an accounting as to the amount of taxes due by appellants.

**Montgomery, J.** (dissenting)

A sympathetic nature is in my judgment one of the finest attributes a man can have. After all, Judges are but human beings. It is only natural that sometimes their sympathies should reach in and react upon their processes of reasoning. It is a normal reaction that is to be guarded against at all times. With all deference I greatly fear that the majority of the Court has allowed their finer feelings of sympathy for the appellants, who are unschooled and unlettered Negroes, to deeply affect their judgment, and that such is reflected in the majority opinion.

But, as said in Tarver v. Lindsey, 161 Miss. 379, 137 So. 93, 96, "It is better that courts may be sometimes wrong, may sometimes fail to find justice, than at any time they shall act arbitrarily, or be bound by anything other than the record of the case as it is made out in court."

Feeling that the determination of this case should be based upon the record as presented to this Court with a sympathetic understanding of the claims of both sides, let us refer to the record and see the testimony that is before the court, and which testimony must control in the decision of this case.

Hattie James came from Chicago to Cleveland in the latter part of March and arrived there on a Friday, the 30th day of March. Her purpose in coming to Cleveland is disclosed as follows:

"Q. Now then you came then to Cleveland from Chicago in the latter part of March, 1945, and you came here for what purposes? A. To pay the taxes on the house, and paint the house.

"Q. You had sent the money for previous years to Cleo Wood to pay your taxes? A. Yes, sir, I did.

"Q. And you presumed that they had been paid? A. Yes, sir, I thought sure it was all paid."

From this it is undisputed in this record that when Hattie James arrived in Cleveland it was her understand-

ing that all taxes for previous years had been paid in full and she was there, according to her own testimony, to pay her taxes for the current year.

The first Monday of April was on the 2nd, and she arrived at the Sheriff's office after noon. The sheriff had completed the sale of lands for taxes that morning. Then as to what occurred when Hattie went to the Sheriff's office we find the record as follows:

"Q. What did you say to the deputy sheriff? A. When I got in there I asked if I could pay the taxes for Will James and Hattie James taxes. Q. And what did he tell you? A. He said to me 'Do you know it has been sold for taxes', and I then told him, 'No, sir, I didn't.' " The Sheriff told her to come back again in order that he might have an opportunity to look up the information needed in regard to the taxes, and thereafter Hattie returned to the Sheriff's office and this is what she said took place: "Q. And what request, if any, did you make of him then? A. I asked him then to let me pay Will and Hattie James' taxes, and he said 'I don't have a record of them and I don't have time to look it up, and you will have to go to the Chancery Clerk's office.' " Hattie then went to the Chancery Clerk's office and the following took place:

"Q. What request, if any, did you make of her? (The Deputy Chancery Clerk) A. I asked her if I could pay Will and Hattie James' taxes.

"Q. What reply, if any, did she make? A. She asked me who sent me there.

"Q. And what reply did you give her? A. I told her then I was sent there from the Sheriff's office.

"Q. All right; what did she say and do, if anything? A. She said she looked through the books, and then she said 'Well, I don't have a record of that, Hattie. You will have to come back on Saturday.' "

Hattie then returned to the Chancery Clerk's office and this took place:

"Q. And what request, if any, did you make of her? A. I asked her if I could still pay Will and Hattie James' taxes.

"Q. What did she say? A. She said she didn't have a record of it.

"Q. Well, did she permit you to pay it? A. No, sir, she didn't.

"Q. Then, what did you do? A. Well, I went on back where I was stopping."

Hattie then called upon Mrs. Shands, for whom she had formerly cooked, and this is what Hattie said took place: "Q. Did you make any request of Mrs. Shands? A. Yes, sir, I did. Q. What was that request? A. I asked her if she could help me in any way to pay my taxes. I had been over four times trying to get to pay them, and I hadn't been able to pay them." Mrs. Shands then rang the Chancery Clerk's office and directed Hattie to go back to the Chancery Clerk's office. Hattie then returned to the Clerk's office and the following occurred:

"Q. All right; then what request, if any, did you make of her? (meaning the Deputy Chancery Clerk) A. That I wanted to pay Will and Hattie James' taxes.

"Q. What then did Mrs. Tatum say or do? A. She didn't say anything; she walked out of the room down the hall, and she came back with this piece of paper in her hand.

"Q. Well, after she came back what, if anything, did she do or say? A. She told me the amount was Sixteen dollars and some cents, and I said I want to pay it in full.

"Q. Wanted to pay it in full? A. Yes, sir.

"Q. What did you say? A. I said to her I wanted to pay the taxes in full, and she told me it was Sixteen dollars and some cents.

"Q. All right. A. And I gave her the money.

"Q. Were you then able, willing and ready and anxious to pay your taxes in full, and each and every dime of taxes owing on your property here? A. Yes, sir, I was.

"Q. What purpose were you there for? What were you trying to do, if anything? A. I was trying to pay taxes, everything that was against the house, I was willing and ready to pay that, and asked to pay it."

Hattie was uncertain as to whether or not she had paid the proper amount and this uncertainty is revealed by the following question and answer: "Q. You thought it would be more than that because they told you it had been sold, is that right? A. That is right."

Hattie then went back to see Mrs. Shands and the following occurred, according to Hattie's testimony: "Q. What report then did you make to Mrs. Shands? A. I went back and I told her the amount that I had paid, the Sixteen Dollars and some cents, and say 'I don't believe that would be all after he had told me it had been sold for taxes, just $16.00 I didn't feel like—I didn't believe that that could have been all that I owed, and I asked her, and she called and she said 'I am calling the Chancery Clerk's office, Hattie, and see.' And she called the Chancery Clerk's office and they told her—. Q. Did she then say anything to you? A. Yes, sir, she told me that they said I had paid all of my taxes, all I owed. Now, Hattie, you can go on back to Chicago; you have paid all you owe."

Mrs. Shands testified that: "I telephoned the Chancery Clerk's office and said Hattie wasn't happy about the amount she had paid and the response was that she had paid the amount that the tax roll called for, or some words to that effect.

"Q. And substantially what information did you elicit from that? A. Well, it thoroughly satisfied me with the answer that she had paid all she owed.

"Q. Paid all she owed; whatever the words were that was the meaning that you got out of it? A. Yes, sir.

"Q. As to the words used by Mrs. Tatum you would not say? A. Well, I couldn't give it verbatim; it has

been too long ago. Whatever she said satisfied me that Hattie did not owe anything else.

"Q. Was that the direction you gave Hattie? A. Yes, sir."

This is all of the testimony in this record showing any request made by Hattie James to the Clerk to redeem from any tax sale. The testimony of Mrs. Mary Emma Tatum, the deputy chancery clerk, with reference to what occurred, is as follows: "As best I remember—I don't remember exactly what she said—she said she came in to pay some taxes.

"Q. Did you understand what year it was that she wanted to pay? A. Yes, sir, she told me what year she wanted to pay.

"Q. What year was that, was that in 1945? A. In 1945, for the 1944 taxes.

"Q. Did she say anything about paying any other taxes than those taxes? A. No, sir.

"Q. Did she ask you, or anybody in your office to check the list of lands sold for taxes to see whether any other tax sales had been made on this land? A. She didn't ask me, and so far as I know, she didn't ask anybody.

"Q. Did she ask you for a complete statement of all the taxes due on the land? A. She did not.

"Q. Did she say anything to put you on notice, or to suggest to your mind that she asked you, or was wanting you to check back on the land sales for taxes to see if there was any other tax sale? A. No, sir.

"Q. Did you check back behind that tax sale to see if there had been a previous tax sale? A. No, sir.

"Q. You don't remember what Hattie James said when she came in? A. What do you mean, what she said about what?

"Q. About her taxes? A. Well, she said she came to pay her taxes, I assume she let it be known that she came to pay her taxes.

"Q. And you assumed from that that she came to pay the 1944 taxes? A. She didn't say she came to pay any particular years.

"A. I don't recall exactly what she said, but I know that she did not ask to pay any other taxes, or ask me to look back to see if there was any other taxes advertised on it because if she had, I would have done it. That was our invariable custom."

If any demand was made by Hattie James upon the Clerk to redeem from the 1944 tax sale for the taxes for the fiscal year 1943, such demand must be found from the testimony set out in this opinion, for this is all the testimony upon the question in this record. And, unless such a demand can be found and such a refusal on the part of the Clerk as will estop him can be found from this evidence, then none exists in this record.

With all deference to the majority, this testimony convinces me that when Hattie James came to Cleveland she came for the purpose of paying her 1944 taxes. That is what she said herself. She had sent the money down to Cleo Wood for paying the taxes for previous years and she felt sure that all taxes for all previous years had been paid. Hattie testified to this herself. When she went to the Sheriff's office it is inescapable that she went for the purpose of paying the 1944 taxes, and had she gotten there before the land had been sold by the Sheriff she would have paid these taxes and gone on back to Chicago satisfied that all taxes due had been paid. The only reason she went to the Chancery Clerk's office was that she was informed by the Sheriff that the land had been sold for taxes and that it would be necessary for her to go to the Clerk's office to straighten out the matter of these 1944 taxes that she desired to pay. It was to straighten out the 1944 taxes, and this alone, that she went to the Chancery Clerk's office. According to her own testimony she did not have in mind any 1944 sale for 1943 taxes, because she felt they had been paid and she had in mind necessarily only the 1944 taxes that she had tried to pay

at the Sheriff's office and because of the sale had been directed by the Sheriff to go to the Chancery Clerk's Office and settle the matter there.

Surely under the law there must be some request of the Clerk to redeem, and in addition a good and proper tender of the amount due must be made to the Clerk, unless tender is excused by a showing that the Clerk would not have acepted the tender if made.

In 62 C.J., p. 670, Sec. 38, the rule with reference to tender is stated as follows: "The rules which govern tenders are strict, and are strictly applied and where the rules are prescribed by statute or rules of court the tender must be in such form as to comply therewith. The tenderer must do and offer everything that is necessary on his part to complete the transaction, and must fairly make known his purpose without ambiguity, and the act of tender must be such that it need only acceptance by the one to whom it is made to complete the transaction. The tender must be made in good faith, and must be definite and certain in character, so as to leave no reasonable doubt that the tenderer intended at the time to make full and unconditional payment. The tenderer must ordinarily declare upon what account the tender is made. The tenderee must be given a reasonable opportunity for intelligent action, and to make an examination or inquiries pertaining to his rights in connection with the transaction in which the tender is being made; readiness to tender is not the equivalent of tender, nor is an offer to purchase a tender of payment. . ."

In Harmon v. Magee, 57 Miss. 410, this Court said: "In view of the serious consequences to the creditor of a doctrine that must often result in the absolute destruction of the debt, and in view of the strong temptation which must exist to make, or at least to prove, sham tenders, the evidence on the subject should be so full, clear and satisfactory, as to leave no reasonable doubt that the tender was so made that the holder must have understood it at the time to be a present, absolute and unconditional ten-

der, intended to be in full payment and extinguishment of the mortgage and not dependent upon his first executing a receipt or discharge or any other contingency."

In the case before us the evidence in the first place does not show that Hattie James in her statements to the Clerk ever disclosed to the Clerk a definite and certain request to redeem from the 1944 sale, nor does it show that she fairly made known to the Clerk such a purpose; or that the Clerk could possibly have been advised from what she said that she had any desire to redeem from the 1944 tax sale. In Harmon v. Magee, supra, it is the express holding that the evidence on the subject should be so full, clear and satisfactory as to leave no reasonable doubt that the tender was so made and that the Clerk must have understood it at the time to be a present, absolute and unconditional tender of the amount due for redeeming from the 1944 tax sale and that Hattie intended it to be in full payment and extinguishment of the State's rights under that sale. No such interpretation can reasonably be placed upon the evidence in this case.

In McLain v. Meletio, 166 Miss. 1, 147 So. 878; Kelly et al. v. Coker et al., 197 Miss. 131, 19 So. (2d) 519; Beauchamp v. McLauchlin, 200 Miss. 83, 25 So. (2d) 771; the cases relied upon by the majority opinion, the Court there had before it in each case a direct and unequivocal request on the part of the tenderer to "redeem" and an absolute and unqualified refusal on the part of the Clerk to accept the redemption money and the offer made to the Clerk was full and clear. There was no reasonable doubt left by the evidence of the fact of the offer to redeem and the refusal by the Clerk to make the redemption. It is a far cry from the facts in those cases to the facts in the case here. Those cases simply have no application to the case at bar. On the other hand, in Little v. Gilmore-Puckett Lumber Co., Miss., 23 So. (2d) 918, the Court used this language: "The case is not saved by Kelly v. Coker, 197 Miss. 131, 19 So. (2d) 519, for the record does not show

any estoppel against the clerk by a demand for a complete disclosure of all taxes due with the tender thereof?" Neither does the record here show any estoppel of the Clerk by a demand for a complete disclosure of all taxes due with tender thereof.

Does the proof in this case establish any refusal on the part of the clerk to accept any tender of the redemption money for the 1944 tax sale? It is difficult to see how any such conclusion can be reached from the testimony in this record. The conclusion that is forced upon my mind by the evidence in this record is that not only did the clerk not refuse to accept a tender of the money for redemption from the 1944 tax sale but the clerk did not know and had no reason to believe that any such tender was even contemplated. Can any one say from the testimony in this record that the clerk is shown to have refused to permit Hattie to redeem? Certainly not, if we look to the testimony alone, as we must do. The only reasonable inference that can be drawn from the evidence is that Hattie did not inform the clerk that she wished to redeem from the 1944 tax sale; she made no tender of the necessary redemption money; the clerk did not know and is not chargeable with knowledge, by law, that she wished to redeem from the 1944 tax sale; and most assuredly he would have accepted the redemption money and permitted her to redeem had she wished so to do and communicated her desire to the clerk.

In addition, it has been announced as fundamental law in this State that the finding of fact by the Chancellor is conclusive upon this Court unless manifestly wrong. Griffith's Chancery Practice, p. 783, Section 674; Fox v. Matthews, 33 Miss. 433; Rose v. Jones, 118 Miss. 494, 496, 78 So. 771; Powell v. Tomlinson, 129 Miss. 658, 659, 92 So. 583.

This testimony convinces me that the Chancellor below was manifestly correct in his finding of fact and I do not feel that this Court can reasonably find from the

testimony in this record that he is manifestly wrong. It is for this reason that I must, with all deference to my fellow judges, dissent from the majority opinion in this case.

**Alexander, J.,** joins in this dissent.