# Hart, Adm'x. *v.* Norton.

No. 41280 November 16, 1959 115 So. 2d 540

*Joe Bullock,* Brandon, for appellant.

*W. E. McIntyre, Jr.,* Brandon, for appellee.

RoBERDS, P. J.

James C. Gilmore departed this life October 14, 1957. He died intestate insofar as this record discloses. He left a small amount of personal property and his home, which consisted of seven lots, the acreage not being shown. His home was located in the western part of Rankin County, Mississippi. He was commonly known as "Jack" and we will call him that unless otherwise designated. On February 19, 1958, letters of administration on his estate issued to his sister Mrs. Sarah Frances Gilmore Hart. Mrs. Hart was his sister of the whole blood and his only heir-at-law. On March 26, 1958, Mrs. Linnie Mae Norton probated a claim against the estate in the sum of $5,475 "for services rendered continuously from October 14, 1954, to October 14, 1957, both dates inclusive, as full time housekeeper and nurse of James C. Gilmore, included the performance of all housekeeping duties, washing and ironing, cooking and general nursing services * * * for said period of time." On the same date Mrs. Norton filed in this cause a petition in the administration proceedings asking the court to decree the estate

indebted to her in said sum for the purpose stated and for a decree for the sale of the homestead property for the payment of said amount. The basis of her claim, as stated in the petition, was that for the last three years of the life of Jack Gilmore she had lived in the home with him and had performed the services enumerated in her probated claim and that these services were rendered under an implied understanding between Mrs. Norton and Jack Gilmore that she would be paid a reasonable sum for her services rendered during the time stated in the probated claim. Mrs. Norton was a sister of the half-blood of Jack Gilmore.

Mrs. Hart, the administratrix, refused to pay the probated claim and, by answer to the petition, denied that the services performed by Mrs. Norton were rendered under any agreement, express or implied. Th chancellor, after a lengthy hearing, entered a decree awarding to Mrs. Norton the sum of $1,080 for her services, and he appointed a special commissioner and empowered and directed him to sell the homestead property left by Jack Gilmore to pay the amount adjudicated to Mrs. Norton. From that action by the chancellor, Mrs. Hart, as administratrix and individually, appealed to this Court.

The only question presented is whether or not the chancellor had sufficient testimony to justify his finding that an implied agreement existed between Jack Gilmore and Mrs. Norton under which Mrs. Norton was to be paid for the services rendered as set out in the probated claim. No complaint is made as to the amount of the allowance. Mrs. Hart contends that no amount whatever should have been allowed.

Thirteen witnesses testified, ten of whom were placed upon the stand by the petitioner and three by the contestant. Mrs. Norton and Mrs. Hart both testified, no objection being imposed to their doing so. We shall detail the testimony which no doubt weighed most heavily upon the conclusion reached by the chancellor.

Some fifteen years before the death of Jack Gilmore, Mrs. Norton went to live in his home. He was a single man and lived in the residence above-described. She did the housework, the laundry, the cooking, etc., to June 1953, when Jack Gilmore entered the Veterans' Administration Hospital. Previous to this time for about ten years, his half-brother, W. W. (Willie) Gilmore, had also resided in the home with Jack Gilmore and Mrs. Norton. No charge was made against Willie by Jack. While at the hospital it was found that Jack was suffering mainly from a blood clot. This clot was removed. He remained in the hospital until August 5, 1953. On that day he returned to his home. He remained in his home until about October 9, 1957, when he returned to the hospital, where he departed this life October 14, 1957.

A large part of the testimony is directed to the state of his health after he left the hospital August 5, 1953, to the date of his death. The testimony is conflicting on that question. To us, the great preponderance of the evidence shows that during that period his condition grew worse. Much of the testimony was also directed to the contention of Mrs. Hart that Mrs. Norton was away from the Gilmore home a part of the time covered by her claim for services to him. The preponderance of the evidence establishes that she went to Florida to see a sick sister. She was gone about a week and brought the sister to Mississippi. It is also in evidence that she made visits to her sister, Mrs. Godwin, at Biloxi, Mississippi, when Jack was in the hospital. In other words, the evidence shows that Mrs. Norton was away from the home very little during the four years Jack was at home after leaving the hospital August 5, 1953. Attempt was also made by contestant to show that Mrs. Norton spent some of her time engaging in outside activities. The evidence shows that this consumed very little of Mrs. Norton's time. The foregoing testimony did have some bearing upon whether or not Mrs. Norton rendered services to Jack during said

period of time. No one contends that she did not do the cooking, washing and keeping of the house from 1941, the year she entered the Gilmore home, to the date of his death. However, the principal question is whether or not these services, and such personal services as she rendered Jack after he came from the hospital, were performed under an implied understanding that she would be compensated therefor. We now refer to the testimony which bears most directly upon that question.

Mrs. Norton stated that she moved into the home of Jack Gilmore in 1941, and his health was then good; that she did the "housekeeping, washing, ironing, scrubbing, general housekeeping", and cooked the meals, that this continued until Jack Gilmore went to the Veterans' Administration Hospital on June 22, 1953; that upon his return to his home she performed the same services, and, in addition, "I had to give him his medicine and keep his clothes clean and all of that", and that Jack was in bed part of the time and required a great deal of personal attention. She said that Jack always told her that the home was as much hers as his; and that when he passed away the home would be hers, and the day before he was taken to the hospital he told her his deeds and papers were in his trunk and that she understood she was to get the home after his death.

F. A. Partlow testified that he knew all of the Gilmores, that he was intimate with Jack Gilmore, and that when Jack came back from the hospital "his leg was swelled up pretty badly. I have always called it blood vessels broken in his legs. It was swelled up pretty big. He pulled up his pants leg and showed me. It was pretty bad." He said he visited Gilmore often and that on one of these visits he asked Jack if he had thought about making a will; that Jack said that Mrs. Norton was taking care of him, and from what was said the witness inferred that he had executed a will in favor of Mrs. Norton. The witness also said "I put the question to him if he was to

die at this particular moment who would get the place and he told me that Miss Linnie Mae would be taken care of.''

W. S. Harvey testified that he lived on adjoining property to the home of Jack Gilmore, that he had known him well since 1941, he knew all of the Gilmores, and that he often visited in the home of Jack. He said after the visit to the hospital that Jack "just hobbled around. His legs was all swelled up''; that he saw him almost every day; that the witness agreed to buy two lots from Jack Gilmore; that he paid Jack for the lots, and a short time later Jack said to him thát he would return the money if the witness would accept it because he wanted to make a will "to Linnie Mae for everything I have got.'' The witness accepted the money and called off the deal. On another occasion, Jack called him into the home and said he had made a will and for the witness to "tell Linnie Mae that the will and all the deeds is in that envelope in my trunk.'' That was just before Jack Gilmore died. On cross-examination, the witness was asked: "Did he tell you he had left everything to her? A. Everything, even to his car. Q. Did he say he had deeded the property to her too? A. Everything. Q. He had willed other property and deeded it to her too? A. Yes, sir. Q. And it was located in a trunk? A. Yes, he said it was in his trunk.'' He went to the hospital that night and died about five days thereafter. Harvey told Mrs. Norton of this conversation. However, the papers mentioned by Jack Gilmore could not be found after his death.

We do not undertake to detail the remainder of the testimony because, as above-observed, most of it bears very little on the specific issue and question which the chancellor decided and which we have to pass upon; besides, in this opinion, we only need to set out enough of the testimony to justify the finding of fact by the chancellor.

 We are not unaware of the rule that where a person rendering services is a kinsman or a member of

the family of the recipient there must be a higher degree of certainty in the evidence relied on to establish an agreement than is ordinarily demanded. Counsel for appellant refers to the case of Hoyle, et al. v. Smith, et al., 113 Miss. 729, 74 So. 611, where this Court announced the rule that the relationship of the parties, and the fact that they were living in the same household raised a presumption that the services were intended to be gratuitous, and that evidence is required to rebut such presumption.

Counsel for appellant also refers to Bell v. Oates, 97 Miss. 790, 53 So. 491, where this Court said that claims brought up for the first time after the death of the decedent are looked upon with disfavor and in order to maintain such a claim the evidence must establish a contract, express or implied, between the claimant and the decedent.

Counsel for appellee refer to the late case of Collins Estate v. Dunn, 233 Miss. 636, 103 So. 2d 425. In that case, Mrs. Dunn moved into the home, with the understanding she would be a beneficiary in the will of the decedent. The Court sustained the claim of petitioner and made this observation: ''when parties make an oral agreement that one is to care for and support the other and that the latter will make compensation therefor and such services are rendered, but not paid for by the latter during his lifetime, the party who has rendered the care and provided the support under such an agreement may recover therefor on the quantum meruit'' basis.

In the case of Stephens v. Duckworth, 188 Miss. 627, 196 So. 219, the father of the claimant expressed his intention to leave the home place to his daughter if she would return and care for his home. The daughter moved into the home and performed the services and was not compensated. On his death bed decedent reaffirmed his intention to leave her the home, although he had not made a will. The facts of that case are similar to the facts in

the case at bar. The Court sustained the claim. This Court observed that while the oral agreement to convey the home could not be enforced yet the proof showed the claimant rendered faithful service, expecting to receive compensation therefor, and sustained the lower court in allowing the claim, although the facts showed compensation was not to be paid until after the death of the decedent.

Another case with similar facts to the case at bar is In Re Whittington's Estate, 217 Miss. 457, 64 So. 2d 580. In that case it was shown that the decedent said that if the claimant and husband moved into the home ''he would see that they were taken care of at his death, and he would leave them a legacy therefor.'' The chancellor found from the evidence that there was a promise to pay at death for the claimant's services but the amount was not agreed upon between them. The court fixed a quantum meruit sum in compensation for the services of the claimant.

Another case bearing upon the issues involved herein is Hickman v. Slough, 187 Miss. 325, 193 So. 443, where this Court said when one performs services for another under a mutual understanding that the latter will make compensation therefor by a legacy in a will, such services are not gratuitous and if the recipient of them does not give the expected legacy, an action lies against his estate for their value.

When there is a promise, either express or implied, to pay for services rendered, and the amount of the compensation is not agreed upon, the law will imply an obligation to pay on a quantum meruit basis. It is, we think, clearly understandable that the chancellor, from the testimony to which we have referred in detail above, and other testimony we might set out, concluded that there was an implied understanding between Jack Gilmore and Mrs. Norton that she would be compensated at his death for the services she had rendered to him; that

she rendered the services, and that they were arduous to Mrs. Norton and of great benefit to Jack Gilmore. She claimed compensation under the circumstances of this case for only three years. This period of time occurred after Jack had undergone a serious operation at the Veterans' Administration Hospital, and when, according to our construction of the testimony, his physical condition was much worse than it had previously been. The chancellor heard the witnesses testify and observed their demeanor while testifying. We do not think we would be justified in reversing his conclusion in this case.

Affirmed and remanded.

*Kyle, Lee, Holmes* and *Arrington, JJ.,* concur.