# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2003-SA-02658-SCT

*QUITMAN COUNTY MISSISSIPPI*

*v.*

*STATE OF MISSISSIPPI, HALEY BARBOUR, IN HIS OFFICIAL CAPACITY AS GOVERNOR AND JIM HOOD, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/7/2003 |
| TRIAL JUDGE: | HON. ANN H. LAMAR |
| COURT FROM WHICH APPEALED: | QUITMAN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | J. CHRISTOPHER KLOTZ |
| | WILLIAM H. VOTH |
| | KATHLEEN A. BEHAN |
| ATTORNEYS FOR APPELLEES: | OFFICE OF THE ATTORNEY GENERAL BY: |
| | BILLY BERRYHILL |
| | HAROLD EDWARD PIZZETTA |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | AFFIRMED - 07/21/2005 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**SMITH, CHIEF JUSTICE, FOR THE COURT:**

¶1.     This case is now before this Court a second time.   Quitman County [hereinafter the County] filed this action for declaratory and injunctive relief against the State of Mississippi, Governor Haley Barbour, and   Attorney General Jim Hood.   The County alleged that Mississippi's statutes requiring the counties to provide legal services for indigent criminal defendants are unconstitutional.   The County sought a declaratory judgment because the State

has allegedly breached its duty to provide effective assistance of counsel, in violation of Article 3, Section 26 of the Mississippi Constitution, and the County also sought an injunction to compel the Legislature to create a statewide, state-funded public defenders' office. After the Circuit Court of Quitman County denied the defendants' motion to dismiss, this Court granted permission for an interlocutory appeal. *State v. Quitman Cty.*, 807 So. 2d 401, 402 (Miss. 2001)( *Quitman I*).

¶2.     This Court held that the County had standing to bring this action and had pleaded facts which, if assumed to be true, were sufficient to withstand a motion to dismiss under Rule 12(b)(6) of the Mississippi Rules of Civil Procedure. *Id.* at 406, 409. This Court affirmed and remanded but stressed that its decision "should not be construed as stating a position" on the constitutionality of the current funding scheme or "[w]hether Quitman County can prove [its] allegations at a full trial on the merits will be determined upon remand." *Id.* at 406, 410. Following a trial on remand, the circuit court found no constitutional violation and entered judgment for the defendants. We agree with the learned circuit judge. Quitman County failed to meet its burden of proof. We, therefore, affirm.

## FACTS AND PROCEEDINGS

¶3.     A bench trial was held in the Circuit Court of Quitman County from April 29, 2003, through May 6, 2003. After the parties had submitted proposed findings of fact and conclusions of law, the court issued a thorough opinion concluding that Quitman County had not met its burden of proving that the funding mechanism established by statute had led to systemic ineffective assistance of counsel in Quitman County and throughout the state. The

2

circuit court's final judgment was entered on November 10, 2003, and Quitman County filed a timely notice of appeal.

**Applicable Law**

¶4.     In *Quitman I*, 807 So. 2d at 410, this Court stated that:

> [t]he question raised by the County's allegations is whether, assuming the State has failed in its duty to provide effective indigent defense, the county-based system has resulted in the inability of the judiciary to operate in an independent and effective manner to the extent that this Court must of necessity, interfere in this traditionally legislative function and order the Legislature to establish a statewide, state-funded system of indigent criminal defense. Again, taking as true the well-pled allegations of the County's complaint, such system constitutional deficiencies would entitle the County to relief.

In *Quitman I*, 807 So. 2d at 406-07, we also recited the applicable law dealing with the representation of indigent defendants and the funding thereof. Art. 3, § 26 of the Mississippi Constitution states, in pertinent part that:

> In all criminal prosecutions the accused shall have a right to be heard by himself or counsel, or both, to demand the nature and cause of the accusation, to be confronted by the witnesses against him, to have compulsory process for obtaining witnesses in his favor, and, in all prosecutions by indictment or information, a speedy and public trial by an impartial jury of the county where the offense was committed....

This provision has been interpreted to create a duty on the part of the State to provide effective assistance of counsel to indigent defendants. *Id. See also Mease v. State*, 583 So. 2d 1283 (Miss.1991); *Wilson v. State*, 574 So. 2d 1338 (Miss. 1990); *Conn v. State*, 251 Miss. 488, 170 So. 2d 20 (1964) (relying on *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963)). Additionally, Art. 14, § 261 of the Mississippi Constitution provides that "[t]he expenses of criminal prosecutions shall be borne by the county in which such prosecution shall be begun."

3

¶5.	Section 25-32-7 of the Mississippi Code Annotated is the statutory authority that requires counties to fund the representation of indigent criminal defendants and specifically provides for the compensation and expenses for the public defender's office.

Section 25-32-7 provides that:

> The public defender shall be provided with office space, secretarial assistance, and all reasonable expenses of operating the office, at least equal to or more than the county prosecuting attorney, or the district attorney if the public defender represents the entire circuit court district. The compensation and expenses of the public defender's office shall be paid by the county or counties if two (2) or more counties are acting jointly. The funds shall be paid upon allowance by the board of supervisors by order spread upon the minutes of the board.

Also, § 99-15-17, in pertinent part provides "[t]he fees and expenses [of counsel for indigents] as allowed by the appropriate judge shall be paid by the county treasurer out of the general fund of the county in which the prosecution was commenced." *Quitman I*, 807 So. 2d at 407.

## DISCUSSION

### I.	Applicable Legal Standard.

¶6.	This Court has held that if the trial court applies the wrong legal standard, the review of the ruling is de novo. *Baker v. State*, 802 So. 2d 77, 80 (Miss. 2001) (citing *Butler v. State*, 592 So. 2d 983, 986 (Miss. 1991) ("[T]he trial court enjoys considerable discretion, and, so long as that court exercises that discretion by reference to the correct legal standards, we will not reverse absent substantial abuse of discretion")). This Court has also stated "where . . . the trial judge has applied an erroneous legal standard, we should not hesitate to reverse." *McClendon v. State*, 539 So. 2d 1375, 1377 (Miss. 1989). This Court has held that it "cannot overturn the decree of a chancellor unless it finds with reasonable certainty that the decree is

4

manifestly wrong on a question of law or interpretation of facts pertaining to legal questions." *Incorporation of the City of Oak Grove v. City of Hattiesburg*, 684 So. 2d 1274, 1276 (Miss. 1996) (citations omitted). Moreover a "'circuit judge sitting without a jury is accorded the same deference with regard to his findings as a chancellor,' and his findings are safe on appeal where they are supported by substantial, credible, and reasonable evidence." *City of Clinton v. Smith*, 861 So. 2d 323, 326 (Miss. 2003) (internal citations omitted).

¶7. At trial, the County had the burden of proving that the State has breached its constitutional duty to provide indigent defendants with effective assistance of counsel by requiring each county to fund its own indigent criminal defense. The County asserted that it cannot afford to discharge its burden of providing funding for indigent defendants in a constitutional manner. Since statutes are presumptively constitutional, when there is a conflict between a statutory scheme and a constitutional provision, it must be "palpable" before the courts of this State will declare a statute unconstitutional. *State v. Miss. Ass'n of Supervisors, Inc.*, 699 So. 2d 1221, 1223 (Miss. 1997). Therefore, the County had to establish the unconstitutionality of this system beyond a reasonable doubt. *Jones v. State*, 710 So. 2d 870, 877 (Miss. 1998).

### The *Strickland* standard

¶8. The County claims that the circuit judge applied the wrong legal standard to the its claims for relief. The County argues that instead of using the standard that this Court and the United States Supreme Court held governs this case, the circuit judge applied a "higher, two part test used only for post conviction challenges by individual criminal defendants"as

5

elaborated in *Howard v. State*, 853 So. 2d 781 (Miss. 2003) and *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). The United States Supreme Court held in *Strickland v. Washington* 466 U.S. at 690, 104 S.Ct. at 2066, 80 L.Ed.2d 674 that:

> Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

The State counters this assertion by saying that the circuit court "unambiguously stated that the question before it was not 'whether in isolated cases the public defenders were ineffective.'" Attorneys David Tisdell and Allan Shackleford were responsible for all indigent cases in the Circuit Courts of Quitman, Coahoma, and Tunica Counties, all appeals in those cases, and for Justice Court indigent representations in Quitman and Tunica. Tisdell replaced Thomas Pearson, who was formerly a public defender until his termination in 2000.

¶9. Even so, the County maintains that the circuit judge mistakenly proceeded as if the case were an individual post-conviction proceeding, in which the County would have had to prove on a case-by-case basis that the attorney's performance was deficient and the defendant was prejudiced. The County states that it does "not seek to overturn particular convictions, but rather seeks a system that meets constitutional guarantees." In her opinion, the circuit judge

6

stated that "[w]hen a statute can be interpreted either as constitutional or unconstitutional, the Supreme Court has long held that they will adopt the constitutional construction. If possible, they will construe it so as 'to enable it to withstand the constitutional attack and to carry out the purpose embedded in the [statute].'" (quoting **Wilson v. State**, 574 So. 2d at 1340). In other words, "[i]t is not this Court's duty to look for factual possibilities or scenarios that would create conflict with the statute, thereby rendering the statute unconstitutional. Rather, this Court's duty is to interpret the Act and envision facts and scenarios in which the statute could be held constitutional." **State v. Jones**, 726 So. 2d 572, 573 (Miss. 1998).

¶10. In **Quitman I**, 807 So. 2d at 408, this Court held that the County would be entitled to the prospective statewide relief it seeks *if* it established the cost of an effective system of indigent criminal defense, the county's inability to fund such a system, and the failure of the existing system to provide indigent defendants in Quitman County with the tools of an adequate defense. The circuit judge ruled that the County failed to establish these facts beyond a reasonable doubt. The County asserts that "[t]he evidence at trial established each of these elements."

¶11. The State correctly points out that "[c]ommon sense suggests that if Quitman County claims there is widespread and pervasive ineffectiveness, the most probative evidence to support that claim would be testimony about specific instances when the public defenders' performance fell below 'an objective standard of reasonableness' as measured by the professional norms." (quoting **Strickland v. Washington**, 466 U.S. at 688, 104 S.Ct. at 2064, 80 L.Ed.2d 674). The State also asserts that the circuit judge expected to hear such testimony at trial since the County alleged in its complaint that requiring each county to pay for its own

public defenders did not satisfy the constitutional requirements for effective assistance of counsel. The record reflects that no such evidence was presented at trial. Likewise, the circuit judge, in her opinion, stated:

> The County alleged that "there have been numerous post-conviction challenges to the adequacy of counsel provided to indigent defendants tried for felonies in Quitman County." However, the County presented *no evidence to the Court of any post-conviction proceedings* which challenged the effectiveness of appointed counsel. The County did not present proof from any defendant who claimed to have received ineffective assistance, nor did they identify any single case where ineffective assistance was alleged. *No proof was presented that any case has ever been overturned in Quitman County because of ineffective assistance*.

The County did not present any evidence on any one of the central factual allegations in its complaint, and the County did not try to show specific examples of when the public defenders' legal representation fell below the objective standard of professional reasonableness.

¶12. The County references the above-cited passage as evidence that the circuit judge "fundamentally misconceived" the nature of its case. However, the record does not offer any evidence that the court or the State thought that the County was seeking to overturn particular convictions. The circuit judge noted that the evidence presented at trial proved that "Quitman County is a small rural county experiencing a high rate of poverty." In her opinion, the circuit judge stated that:

> The evidence shows that Quitman County spends less than 1% of the county budget on indigent defense, $38, 352 per year. This expenditure has remained the same since 2000. Testimony revealed that the county's deficit was mainly a result of spending in the area of solid waste, other unfunded mandates, natural disasters, and economic development bonds that were not being repaid. While the County established that it is struggling to meet its financial obligations and has had to cut funding in some areas, there was no testimony that resources to fund schools, hospitals, and local law enforcement were reduced because of indigent defense costs as was alleged in the Complaint. The Court is convinced

8

that indigent defense is neither the cause not the solution to the county's financial difficulties.

### Essential tools of defense

¶13. In addition to claiming that the circuit judge applied the wrong legal standard, the County also maintains that even under the *Strickland* analysis, it did show that the essential tools of defense were not provided. The County claims that, like this Court in the case at bar, other courts have concluded that prospective challenges to indigent defense systems were not subject to the requirements of *Strickland*, and that the proper inquiry is whether the system provides the tools of an adequate defense. The County further explains that there were distinct differences between the applicable standards to post-conviction proceedings and to systemic challenges. In a post-conviction challenges, the County avers that "courts attempt to balance the individual defendant's interest in challenging his conviction against broader interests in judicial economy and finality." (citing *Strickland v. Washington*, 466 U.S. at 693-94). The County argues that courts must "look to whether the system provides the essential tools of an effective defense across the broad run of cases," and that "the performance of a particular lawyer or the result in any one case is not decisive."

¶14. The County then claims that even under the post-conviction cases that use the *Strickland* analysis, it has demonstrated that the county-based system does not provide the tools of an adequate defense. The County cites numerous post-conviction cases that follow *Strickland* that have identified other tools that the county-based system does not provide as fundamental to effective assistance of counsel. *See, e.g.*, *Wiggins v. Smith*, 539 U.S. 510, 123 S. Ct. 2527, 156 L. Ed 2d 471 (2003) (investigation of mitigation evidence); *Bell v. Cone*, 535

U.S. 685, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002) (failure to call witnesses and waiving of argument in sentencing phase); *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000) (investigation of mitigation evidence); *Roe v. Flores-Ortega*, 528 U.S. 470, 120 S. Ct. 1029, 145 L. Ed. 2d 985 (2000) (failure to file notice of appeal); *Smith v. Robbins*, 528 U.S. 259, 120 S. Ct. 746, 145 L. Ed. 2d 756 (2000) (failure to file merits brief without consent); *Hill v. Lockhart*, 474 U.S. 52, 106 S. Ct. 366, 88 L. Ed. 2d 203 (1985) (guilty plea challenges). The County also cites several cases decided by this Court such as *State v. Tokman*, 564 So. 2d 1339, 1343 (Miss. 1990) (citing *Gaines v. Hopper*, 575 F.2d 1147, 1150 (5th Cir. 1978)), which held that meaningful discussions regarding the realities of a case are the "cornerstones of effective assistance of counsel." *Tokman* also held that counsel has, at a minimum, "a duty to interview potential witnesses and to make an independent investigation of the facts and circumstances of the case." *State v. Tokman*, 564 So. 2d at 1342.

¶15. The County also references the *Triplett* case, in which this Court held that a defendant is entitled to a basic defense, and that a basic defense in *Triplett* required "complete investigation to ascertain every material fact about this case, favorable and unfavorable." *Triplett v. State*, 666 So. 2d 1356, 1361 (Miss. 1995). The County concludes that if the circuit judge had "assessed the tools of an adequate defense in light of this Court's prior decisions and standards, it would have been clear that the county-based system in Quitman and counties does not provide the essential tools of defense and therefore violates the constitutional guarantee of effective assistance of counsel."

10

¶16.    The circuit judge's opinion discussed in depth the claims raised by the County regarding the lack of essential tools of defense.   In response to the County's allegation that "lack of counsel and excessive caseloads promotes pretrial delay . . . accordingly, excessive pretrial delays have caused Quitman County to spend its own funds to hold defendants in county custody," the court stated that testimony during trial established that "Quitman County has averaged thirty-four (34) indigent defendants per year in Circuit Court since 1999."   Further, that "each public defender is required to be in Justice Court one day each month, an average of seventeen (17) cases per public defender per year in Circuit Court.   Certainly, this does not represent an excessive caseload for the two public defenders in Quitman County, as alleged." The circuit judge also held that:

> The two public defenders also take on indigent cases in two neighboring counties in this circuit court district and also represent private clients.   The County contends that the public defenders average 165 cases a year in civil and private and indigent criminal cases, and that this is excessive.   The Court is satisfied that those directly involved in the Quitman County criminal justice system, that is, the two public defenders and the three circuit judges, are in a better position than the Court to judge the weight of their caseload.   Each of these testified that the caseload was not excessive and the defenders did not feel overburdened with their caseload.   Mr. Shackleford testified that the public defenders were not allowed to schedule other cases during Circuit Court terms without permission of the Circuit Court Judge.

The circuit judge also attributed the pretrial delay to the fact that "Quitman County has two terms of court each year, with approximately six months between terms of court, which necessarily results in pretrial delays in processing felony cases."   The circuit judge concluded that the delays "cannot be attributable to the public defender program."

¶17.    The County also contends that due to the chronic underfunding of indigent defense, the result was ineffective assistance of counsel which in turn, adversely affected the administration

11

of justice in Mississippi. The County supports this allegation by stating that there have been "an unusually high number of guilty pleas entered on the day of appointment of counsel, public defenders are not provided investigators, public defenders most often meet defendants in mass in the courtroom, public defenders are not provided office space, there is little motion practice in Quitman County and that the part-time flat fee public defender system is conducive to ineffective counsel." This argument was not persuasive to the circuit judge because in summary, none of the public defenders for this judicial district, circuit judges, or district attorneys testified to this effect. Further, none of the three witnesses tendered by the County as experts concluded in their testimony that either of the public defenders in Quitman County was incompetent. More specifically, Steven Farese, who was accepted as an expert, stated that he understood he was to "testify as to the regularly accepted methods of defending a criminal defendant in an adequate manner and also testify as to what I have observed and read through the practices of Mr. Tisdell and . . . Mr. Pearson and Mr. Shackleford and their representation of indigent defendants in Quitman County." Farese stated that his opinion was that "there's not one single case that you can point to and say that this person or that person is ineffective because it doesn't work that way," but he concluded that the system as a whole was ineffective.

¶18. Similarly, Dr. Steven Bright, the director of the Southern Center for Human Rights, testified that, with regard to his observations on how indigent defense is provided in Quitman County, "it is not so much about the lawyers . . . I would say it's the system or more precisely the absence of a system that I find impressive." The County also complains about the public defenders' not having investigators, but the circuit judge, in her opinion, stated that "[t]he Mississippi Supreme Court has confirmed that the right to counsel does not require an

12

investigator or expert 'absent a showing of substantial need' and has held that the Circuit Court should review such requests on a case-by-case basis." *See* **Hansen v. State**, 592 So. 2d 114, 125 (Miss. 1991).

¶19.     Upon consideration of the briefs, the record, and the evidence contained therein, this Court finds that the circuit judge did not apply the wrong legal standard to the County's claims for relief.


### II.     Applicable Legal Standard and Financial Injury.

¶20.     The County also contends that the circuit judge misconstrued the applicable legal standard with respect to financial matters.     According to the County's interpretation of this Court's previous decision regarding Quitman County, the County had to "show the cost of an effective system of indigent criminal defense" and "the County's inability to fund such a system." **Quitman I**, 807 So. 2d at 408.  The County avers that it met its burden and established that it cannot afford to pay any more than it presently does for indigent defense.  In response, the State claims that the County's evidence regarding its financial condition showed that the County had sufficient resources to fund a constitutionally adequate indigent defense system and that the County's obligation to pay for indigent defense in non-capital cases has neither caused the County's present economic troubles nor forced the County to substantially reduce other governmental services.

¶21.     More specifically, the County alleged in its complaint that Mississippi's current indigent defense system has "imposed enormous and unpredictable" costs and that the "financial resources available to fund schools, hospitals, local law enforcement and the

traditional health, safety, and welfare obligations of county government have been substantially reduced." However, Butch Scipper, the Quitman County Chancery Clerk, admitted that the reason for the unpredictable spikes in budgetary outlays was the expense of defending capital cases–a potentially ruinous cost that is no longer borne by the counties. This cost was alleviated by the creation of the Office of Post-Conviction Counsel and the Office of Capital Defense Counsel in 2000.[1] On March 21, 2005, Governor Barbour signed into law effective July 1, 2005, Senate Bill 2960, which creates the Office of Indigent Appeals. This newly created office will be responsible for handling appeals for the indigent defendants that have been convicted of non-capital crimes.

¶22. The circuit judge also found no evidentiary support for the County's assertion that the cost of providing indigent defense services had led to decreased funding for other essential services. As previously mentioned, the circuit judge found the County's deficit was "mainly a result of spending in the area of solid waste, other unfunded mandates, natural disasters, and economic development bonds that were not being repaid." Again, the circuit judge found that "there was no testimony that resources to fund schools, hospitals, and local law enforcement were reduced because of indigent defense costs as was alleged in the Complaint. The Court is convinced that indigent defense is neither the cause nor the solution to the county's financial difficulties."

---

[1] As previously noted, during the 2005 Regular Session, the Mississippi Legislature took an initial step toward that end by passage of Senate Bill 2960, which creates and provides for administration and funding of the Mississippi Office of Indigent Appeals. Approved by the Governor on March 21, 2005, this act became effective on July 1, 2005.

¶23. The County claims that the circuit judge disregarded the evidence it presented through the expert testimony which unanimously concluded that "a statewide, state-funded system is needed to provide the tools of an effective defense." The County further explains that "even if one were to hypothesize a standalone county system that provided adequate defense tools, Mr. Farese's opinion was that it would cost $300,000 to $500,000, 10 to 15 times what Quitman can pay." The County asserts that the circuit judge, in addition to disregarding this evidence, never reached the issue framed by this Court and instead, addressed a different one. The County stated that "[u]nder this newly devised test, the county could prevail only if it showed indigent defense was the *sole* cause of the county's financial problems and that these problems would disappear if the financial burden of indigent defense were lifted." The State rebuts this argument by stating:

> [o]f course, the County's expert did not explain why a full time public defenders' office in a county with a population of 10,000 would cost more than the full-time office in a county (Jackson County) with more than 130,000 people. But even assuming that the cost estimate is correct, the County's argument ignores a crucial point: The Circuit Court found that Quitman County's system of providing indigent defense services is not providing constitutionally inadequate legal representation, *even at the current level of funding*. Unless the County was able to show that it was providing inadequate services, the question of its ability to pay thousands of dollars more per year simply does not come into play.

¶24. The State correctly points out that the County "seems to argue that it put on all the proof it needed when Chancery Clerk Scipper announced that the County cannot afford to pay any more for indigent defense than it already does." However, the County does not mention the testimony and documentary evidence that discussed the County's discretionary spending as well as its spending priorities. The State accurately concludes that "[i]f the Quitman County

Board of Supervisors made indigent defense a higher priority, the County could find the additional funds–even if that meant less discretionary spending on recreation and similar projects."

¶25.    Similarly, it was not plausible for the County to maintain that the Legislature is prohibited from imposing financial burdens on counties because it is well established that each county is an agency or subdivision of the state, created for administration and other public purposes. *See State v. Hinds Cty. Bd. of Sup'rs*, 635 So. 2d 839, 843 (Miss. 1994).  As this Court held, "[t]he revenues of a county are subject to the control of the Legislature, and when the Legislature directs their application to a particular purpose or to the payment of the claims of particular parties, the obligation to so pay is thereby imposed on the county." *Jackson Cty. v. Neville*, 131 Miss. 599, 95 So. 626, 629 (1932).

¶26.    The circuit judge found insufficient evidence that the County's public defenders are providing ineffective assistance on a regular basis, and the judge also determined that the County could afford to spend more if it chose to and the spending on indigent defense was not the cause of the deficit.  The circuit judge's findings are not askew from the applicable standard with which this Court reviews this issue.  Therefore, this issue is without merit.

¶27.    For the aforementioned reasons, this Court finds that the circuit judge did not apply the wrong legal standard in concluding that the County did not prove financial injury.

### III.    Two Key Evidentiary Rulings.

¶28.    The standard of review on appeal from evidentiary rulings is prescribed by Rule 103(a) of the Mississippi Rules of Evidence, which states "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected . . . ."  This

16

Court articulated the standard of review of evidentiary rulings and stated that "[o]ur standard of review for the admission of or refusal to admit evidence is well settled. 'Admission or suppression of evidence is within the discretion of the trial judge and will not be reversed absent an abuse of that discretion.'" *Church of God Pentecostal, Inc. v. Freewill Pentecostal Church of God, Inc.*, 716 So. 2d 200, 210 (Miss. 1998) (citing *Broadhead v. Bonita Lakes Mall, Ltd P'ship*, 702 So. 2d 92, 102 (Miss. 1997) (quoting *Sumrall v. Miss. Power Co.*, 693 So. 2d 359, 365 (Miss. 1997))).

¶29. In applying that standard, the reviewing court may reverse a case only if "the admission or exclusion of evidence, . . . result[s] in prejudice and harm or adversely affect[s] a substantial right of a party." *K-Mart Corp. v. Hardy*, 735 So. 2d 975, 983 (Miss. 1999) (citing *Hansen v. State*, 592 So. 2d 114, 132 (Miss.1991)). Abuse of discretion is found when the reviewing court has a "definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon weighing of relevant factors." *Caracci v. Int'l Paper Co.*, 699 So. 2d 546, 556 (Miss. 1997). Accordingly, the reviewing court "must let stand a trial judge's findings of evidentiary or ultimate fact when substantial evidence in the record supports those findings, or when the findings are not 'clearly erroneous.'" *Crowe v. Smith*, 603 So. 2d 301, 305 (Miss. 1992) (quoting *Matter of Estate of Varvaris*, 528 So. 2d 800, 802 (Miss.1988)).

¶30. The County claims that the circuit judge committed prejudicial error in two evidentiary rulings, which in turn, affected a substantial right of Quitman County. The first purported error occurred when the circuit judge barred the County from introducing expert testimony that the

17

indigent defense system has affected the independence and effectiveness of the courts, and the second purported error occurred when the judge allowed local circuit judges to offer their opinions on the competence of the public defenders.

### Expert testimony

¶31. The County interprets this Court's previous decision as identifying as a triable issue whether "the county-based system has resulted in the inability of the judiciary to operate in an independent and effective manner." *Quitman I*, 807 So. 2d at 410. The County also concludes, from this Court's previous opinion, that if such an effect is shown, then this Court must necessarily intervene and "order the Legislature to establish a statewide, state-funded system of indigent defense." *Id*. The County also contends that the circuit court barred it from introducing evidence on the issue that the "integrity of the judicial system has been compromised by the State's failure to provide the essential tools of an effective defense." The County alleges that this evidence was "critical to the outcome of this case." Farese was asked if he had "any fears for the integrity of our court system, should the system of indigent defense here in Quitman County continue?" The State's objection was based on relevancy because the State was unsure how "fears of integrity" related to Article 3, Section 26 of the Mississippi Constitution. Miss. R. Evid. 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The comment to Rule 401 states that "[i]f the evidence has any probative value at all, the rule favors admission." The County contends that "[a]s was apparent from the context in which the questions were asked, Mr. Farese's expert opinion would have been that the county-based system of indigent defense

18

system has compromised the integrity of the criminal justice system in Mississippi–an ultimate issue in the case under Miss. R. Evid. 704–and described the ways in which that compromise has occurred."

¶32. However, at trial, the State argued that such opinion testimony was inadmissible, irrelevant, and unhelpful in the sense that allowing attorneys to testify as experts on the ultimate legal issue simply invites a "battle of experts on an issue which is squarely resolvable only by the Court." Thomas M. Fortner, the public defender for Hinds County, was accepted as an expert in the field of indigent defense. Further, the circuit judge acknowledged that although having attorneys experts offering opinions on the ultimate legal issue might not be very helpful, she would allow:

> this witness [Fortner] to testify as an expert in the field offered of indigent defense and I do think that he has specialized knowledge through his experience and training. And as to the ultimate question or the legal conclusion which must be drawn, that is a question for the Court and I would just as soon you stay away from it. But I know that there are matters that Mr. Fortner can assist the Court on and I will allow him to testify and give those opinions.

In other words, the circuit judge would allow expert opinion on specific fact-based matters and would be less inclined to hear sweeping, unsupported opinions. The Comment to Miss. R. Evid. 704 solidifies the judge's purpose in asking the parties to "stay away" from opinions on the ultimate issue. The Comment to Rule 704 states that even though "ultimate issue" opinions may be admissible, "[a] question may not be asked which is based on inadequately explored legal criteria since the answer would not be helpful." As the State correctly asserted, "[t]he trial court, who was sitting as the trier of fact, was merely giving the parties some guidance about what opinion testimony would be useful in deciding the issues." The circuit judge's

19

approach to the expert testimony offered in the case sub judice was that the court, sitting as a trier of fact, did not find it helpful to have a parade of experts declaring *ex cathedra* that the system is unconstitutional. Simply stated, the circuit judge allowed opinion testimony as long as there was sufficient background testimony to render the opinion helpful.

¶33. It was against this background that Farese took the stand and offered his many opinions regarding indigent defense systems in general and Quitman County in particular. As the State correctly points out, Farese's extensive testimony took up almost one-hundred pages of the trial transcript. The circuit judge only refused to allow Farese to answer two final questions. The County alleges that the exclusion of this "one last question" for Farese's opinion on the "integrity of the court system" constituted reversible error. Farese had already addressed his specific concerns about the indigent defense system in his extensive testimony, and allowing one final, sweeping opinion during re-direct examination was redundant and unnecessary. Therefore, the circuit judge's decision was not an abuse of discretion.

### Testimony of circuit judges

¶34. The County claimed that the circuit judge committed reversible error by allowing three circuit judges to testify and offer opinions about the competency of the public defenders *after* instructing the County to "stay away from" expert testimony on ultimate questions of fact. The County further alleged that the circuit judge "gave dispositive weight to these conclusory opinions, which had little or no evidentiary foundation in the record." The circuit judge explained her reasoning for rejecting the County's request to exclude the judges' testimony by observing that it would have been unfair to allow the County to challenge the

20

constitutionality of "this very system over which these three circuit judges preside" but not let the judges share their observations on how the system works.

¶35. When the State announced at pretrial that it intended to call sitting circuit judges to testify, and the County moved in limine to exclude the anticipated testimony, the circuit judge denied the motion. In doing so, she stated that she would not compel their testimony, nor would she allow them to be called as expert witnesses or offer legal opinions. She further stated that these circuit judges "do have much information basically based on their own personal observations which would be helpful to this trier of fact."

¶36. When Circuit Judge Albert B. Smith, III, was called to the stand, the court reiterated, for the benefit of the witness as well as the parties, that his testimony should remain limited to personal observations about how the Quitman County public defender system works. Judge Smith made general observations about the public defenders' "winning a lot of their cases" as well as the frequency and quality of motions. Judge Smith stated that "[t]hey file motions with me, and they ask for expert witnesses in certain cases, and they, of course, try the cases themselves. As far as being prepared, I think they have a pretty good track record as far as their wins." Judge Smith also specifically addressed plea agreements and the procedure thereof, which was an area greatly criticized by the County. He even said that "a lot of times I repeat what's in the petition and sometimes more so when a defendant is one that has a low education or . . . doesn't seem to comprehend exactly what the scenario is. Sometimes we will take a break, and I will let him go and confer with his attorney."

¶37. Circuit Judge Larry Lewis was then called to testify about the appointment of public defenders in Quitman County Circuit Court, the judges' standard practices for accepting pleas,

and the public defenders' handling of motions and trials. He explained that the judges require each defendant to "certify to the Court that the defendant has informed his lawyer [of] everything he knows about the charge, the facts of the case," before the court will accept the guilty plea. Judge Smith stated that purpose of the plea colloquy is to ensure that this communication occurs between the attorney and his client. He also said that the circuit judges directly ask each defendant whether or not he committed the crime and stated that "[i]f the defendant falters in any way at that point, the plea is off." Judge Lewis further attested to the fact that he had observed Quitman County public defenders both in his capacity as a county prosecutor as well as a circuit judge, and that he always found them well-prepared. He also testified that the public defenders regularly file various motions, including motions to suppress evidence, and he stated that he had not observed any differences in how the public defenders represented their indigent clients as opposed to their paying clients. When he was asked whether the public defenders were "effective advocates," Judge Lewis carefully limited his answer to the "results of their work" and testified that they were competent in the sense that they prevail in many of their cases.

¶38. The personal knowledge of the judges regarding what they observe the lawyers doing in their courtroom was the reason that they were called as witnesses. The circuit judge did not abuse her discretion by relying on the judges' testimony to help her determine whether the public defenders' caseload was excessive, whether indigent defendants were entering into ill-advised plea agreements, and whether the public defenders take their obligations as such seriously. Furthermore, the circuit judge did not treat their testimony as expert opinion

22

testimony on the issue of whether the public defenders were providing constitutionally adequate representation, so the admission thereof was not erroneous.

### IV. Other Evidence.

¶39. The County avers that the circuit judge "ignored entire categories of expert and lay witness testimony, authoritative standards, government studies, and defense witness admissions establishing key facts that the [this] Court held are determinative of Quitman's claims." However, the County incorrectly accuses the circuit judge of ignoring that evidence simply because she refused to draw inferences favorable to the County or because she found the County's evidence less probative than that submitted by the State. In its brief, the State accurately asserts that the County cannot retry its case on appeal and states that this Court is required to accept as true all "evidence which supports or reasonably tends to support the findings of fact made below, together with all reasonable inferences which may be drawn therefrom and which favor the lower court's finding of fact. That there may be other evidence to the contrary is irrelevant." *Par Indus., Inc. v. Target Container Co.*, 708 So. 2d 44, 47 (Miss. 1998) (internal citations omitted). The County's argument fails to consider the evidence within the record that was unfavorable to its position.

¶40. For example, the County points out that its public defenders have a total caseload of around 165 cases per year, even though the American Bar Association standards recommend handling no more than 150 cases per year. Since the court heard first-hand testimony about the caseload of the public defenders in Quitman County which indicated that they were *not* overwhelmed by their work, the County could not reasonably expect the circuit judge to have

23

found that the public defenders' handling of 165 cases instead of 150 cases had either resulted in or contributed to widespread ineffective assistance of counsel.

¶41. The County, by asserting the circuit judge ignored evidence, also fails to take into account the testimony of the circuit judges which contradicts the contentions of the County. The County also fails to address the public defenders' testimony about how they generally conduct investigations themselves and decide on a case-by-case basis whether or not to use the services of a professional investigator or retain an expert witness, ways in which they use their own offices, secretarial staff, computers, and other resources, conduct discovery, and communicate with clients. As previously referenced, the testimony of the judges and public defenders was the *only* first-hand account of how the system actually operated, so the circuit judge properly considered the testimony helpful in determining whether there has been a widespread ineffective assistance of counsel in Quitman County as a result of the county-based indigent defense system. The State correctly contends that "[e]ven if the County had prevailed on the first issue addressed by the Circuit Court, the County still would not have been entitled to the relief it requested. In making this argument, the State cites to *Wilson v. State*, 547 So. 2d at 1340-41, where this Court did not find sufficient grounds with which to enjoin the Legislature to expend public funds on the defense of indigent criminals.

¶42. For the reasons previously enumerated, this Court finds that the circuit judge's decision is not against the overwhelming evidence or an abuse of her discretion, but is instead, amply supported by the evidence presented at trial.

**V.      This Court's Prior Dissent and Personal Opinion.**

24

¶43.   This Court's "review of a chancellor's findings of fact is the manifest error/substantial evidence rule." *Miss. State Tax Comm'n v. Med. Devices, Inc.*, 624 So. 2d 987, 989 (Miss. 1993).   The findings of the circuit court are accorded the same deference as a chancellor's fact findings.   *Kight v. Sheppard Bldg. Supply, Inc.*, 537 So. 2d 1355, 1358 (Miss. 1989) (citing *Hardy v. First Nat'l Bank*, 505 So. 2d 1021, 1023 (Miss. 1987)).

¶44.   The County's final assignment of error is based on the closing paragraphs of the circuit court's opinion.   In its brief, the County avers that the circuit judge violated Canon 3A of the Code of Judicial Conduct by injecting "an unfortunate note of personal opinion into a decision of statewide significance and constitutional import, *and* contrary to the expressed view of the majority of the *Quitman* Court."   The passages the County found objectionable are quoted in full as follows:

> The County bears the burden of proving that the rights of indigent defendants are being violated in Quitman County and across the state to the extent that this court should hold the funding scheme established by our legislature as unconstitutional.   While this lawsuit has raised issues of statewide concern which give rise to serious constitutional dilemmas, the Court concludes that the County falls short of demonstrating that indigent defendants in Quitman County are receiving ineffective assistance of counsel.   Additionally, the County has not proven that the county-based system has resulted in the inability of the judiciary to operate in an independent and effective manner . . .This Court cannot say that this is one of those rare occasions when the courts should exercise its inherent power and 'interfere with this traditionally legislative function and order the Legislature to establish a statewide, state-funded system of indigent defense.'

> The question before this Court is not whether the county-based system is the best system of indigent defense.   The question is not even whether in isolated cases the public defenders were ineffective.   Rather, the question is whether Mississippi's county-based system is a constitutionally adequate system of indigent defense.   This Court finds that our system meets constitutional demands.   This is not to say that another approach would not be more desirable.   This Court agrees with the sentiments expressed by three justices in the

25

dissenting opinion in *State v. Quitman County*, 807 So. 2d at 413 (Pittman, C.J., dissenting):

> I agree that it would be wise of the Legislature to create and fund a statewide public defenders' office. However, the Legislature has attempted to solve the problem of indigent defense in other ways. By its actions, the Legislature has shown that it is not blind to the plight of Quitman County. It is the Legislature which hold the key to solving these problems, not this Court by impressive and excessive exercise of judicial authority.

The County asserts that by quoting the dissent and expressing her agreement, the circuite judge based her opinion on materials outside the scope of prevailing law. The County further questions her fidelity to the law, as required by Canon 3A of the Mississippi Code of Judicial Conduct.

¶45. This argument is without merit because the circuit judge found that County did not meet its burden at trial, then it is not entitled to the possible relief that was enumerated by the majority of the Court in *Quitman*. Although her ideas regarding the proper way to gain the relief sought *if* the burden had been met were contrary to the majority's opinion, she was in no way violating her duty to remain faithful to the law. Clearly, the circuit judge recognized that even though the county-based system may not be the "best" way, it is constitutional. As the State points out, the circuit judge's "ability to distinguish between her own personal views about the desirability of a statewide public defenders' office and her judicial authority to grant that relief given the facts of this case is commendable; it is not grounds for reversal." This Court, in *State v. Hosford*, 525 So. 2d 789, 798 (Miss. 1988), held that while the Legislature has the authority "to furnish what funds and facilities it deems proper," the courts may, nevertheless act in cases of necessity when the Legislature fails to furnish the essentials

26

required for the operation of an independent and effective court. *Quitman I*, 807 So. 2d at 410 (quoting *State v. Hosford*, 525 So. 2d at 798). Conclusively, the County did not meet its burden of proving that the county-based system has resulted in widespread ineffective assistance of counsel. Therefore, the County cannot carry the further burden of showing that its requested injunction was the proper remedy. The County urges this Court to implement a remedy that falls within the purview of the Legislature instead of the judiciary.

¶46. This Court recognizes that multiple amicus curiae briefs have been filed with this Court, and the majority of which, encourage this Court to order the Legislature to move to a state-wide indigent defense system. Some of the amici include in support of the County's position are: the Mississippi Trial Lawyers Association, Sheriffs of Quitman County, et al., the Mississippi Association of Supervisors, the National Legal Aid and Defender Association, the Mississippi Circuit Clerks' Association and the Mississippi Chancery Clerks' Association, NAACP Legal Defense and Educational Fund, Inc. and 100 Black Men of Jackson, Inc. The only amicus brief filed in support of the State was filed by the Mississippi State Legislators.

## CONCLUSION

¶47. For the reasons set forth above, this Court finds that the circuit judge was correct in concluding that Quitman County did not met its burden of proving that the funding mechanism established by statute led to systemic ineffective assistance of counsel in Quitman County and throughout the state. Therefore, the judgment of the circuit court is affirmed.

¶48. **AFFIRMED.**

**WALLER AND COBB, P.JJ., EASLEY, CARLSON AND RANDOLPH, JJ., CONCUR. GRAVES, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, J. DIAZ, J., NOT PARTICIPATING.**

27

**GRAVES, JUSTICE, DISSENTING:**

¶49.　The majority holds that the trial court applied the correct legal standard to Quitman County's ("Quitman") claims of relief.　However, the trial judge's analysis of the facts focused on isolated cases, rather than the systemic challenge brought by Quitman.　Further, the trial court's failure to consider credible, unrebutted evidence establishing the deficiencies of Quitman's indigent defense system severely undermined its ruling. Applying the correct legal standard to the credible evidence in this case, Quitman is entitled to the relief sought. Therefore, I respectfully dissent.

*Trial Court Applied the Incorrect Legal Standard*

¶50.　Three years ago, this Court ruled that if Quitman could demonstrate that a lack of state funding resulted in a local system of indigent defense representation "fall[ing] beneath the minimum standard of representation required by the Mississippi Constitution," then Quitman would have established that the State "breached its constitutional duty to provide indigent defendants with effective assistance of counsel. *See State v. Quitman County,* 807 So.2d 401, 408-09 (Miss. 2001) ("*Quitman I"*).　In *Quitman I,* this Court allowed Quitman, upon satisfying the above threshold, to seek prospective relief from the State.　Significantly, in our earlier opinion, this Court neither stated nor implied that in order for Quitman to succeed it needed to show prejudice to any particular client.

¶51.　The majority points out that the circuit court "unambiguously stated that the question before it was not 'whether in isolated cases the public defenders were ineffective.'" The trial court failed in its attempt to correctly frame and address the relevant issue.　Focusing on the

28

incorrect issue (the isolated cases where the public defenders were ineffective), the trial court then applied the incorrect legal standard. The trial court applied the higher, two-part test used only for post-conviction challenges by individual criminal defendants under ***Howard v. State,*** 853 So.2d 781 (Miss. 2003) and ***Strickland v. Washington,*** 466 U.S. 668, 688, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Essentially, the circuit court proceeded as if this were an individual post-conviction proceeding and Quitman had to prove on a case-by-case basis that the attorney's performance was deficient and the defendant was prejudiced, i.e., but for these deficiencies, there would have been a different outcome at trial. To this end, the circuit court repeatedly criticized Quitman's proof for supposed failure to show "incompetence" and prejudice in particular cases that would have warranted reversal of the conviction under ***Howard*** and ***Strickland.*** These criticisms were unwarranted considering that the record is replete with evidence of incompetence and ineffectiveness in the operation of Quitman's indigent defense services.

¶52. Here, the circuit court fundamentally misconceived Quitman's case and arguments. Quitman's complaint is that "the existing county-based system results in an inadequate and unconstitutional system of indigent defense." Quitman never sought to overturn particular convictions, but rather to challenge the constitutionality of systemic ineffective assistance of counsel. Therefore, the trial court's requirement that Quitman demonstrate some form of prejudice was completely misguided and legally erroneous. Because ***Quitman I*** allowed Quitman to seek prospective relief, I am convinced that a prejudice requirement is wholly inappropriate in a case where prospective relief is sought.

29

¶53. Other courts have concluded that prospective challenges to indigent defense systems are not subject to the requirements of *Strickland* and that the proper inquiry is whether the system provides the tools of an adequate defense. *See Luckey v. Harris,* 860 F.2d 1012, 1017 (11th Cir. 1988); *State v. Peart,* 621 So.2d 780, 791 (La. 1993) (creating "rebuttable presumption" that "indigents . . . are receiving assistance of counsel not sufficiently effective to meet constitutionally required standards" to be applied prospectively); *New York County Lawyers' Ass'n v. State,* 745 N.Y.S.2d 376, 384 (N.Y. Sup. Ct. 2002).

¶54. The distinction between the standards applicable to post-conviction proceedings and to systemic challenges rests on the very different policies applicable in the two kinds of cases. In a post-conviction challenge, courts attempt to balance the individual defendant's interest in challenging his conviction against broader interests in judicial economy and finality. *Strickland,* 466 U.S. at 693-94. The concerns about certainty and finality of past criminal convictions do not arise in systemic cases. In those cases, society's interest in the provision of an effective defense to all citizens is of paramount proportions. *See Luckey v. Harris,* 860 F.2d at 1017; *New York County Lawyers Ass'n v. State,* 745 N.Y.S. 2d at 384. Accordingly, courts look to whether the system provides the essential tools of an effective defense across the broad run of cases; the performance of a particular lawyer or the result in any one case is not decisive.

¶55. Because the trial court failed to properly consider Quitman's systemic challenge to the county's indigent defense system, and thereafter applied an incorrect legal standard, I cannot agree that either the trial court or the majority reached the correct result.

30

*The Trial Court Failed to Consider Credible, Unrebutted Evidence as to the Deficiencies of Quitman's Indigent Defense System*

¶56.    Upon a through review of the record and briefs in the instant case, it is apparent that the circuit court completely ignored entire categories of expert and lay witness testimony, authoritative standards, governmental studies, and defense witness admissions which highlighted the deficiencies of Quitman's indigent defense system.    For instance, in determining whether essential tools were provided to a defendant to assist in his defense, courts look to objective criteria promulgated by the American Bar Association and other standard-setting bodies. *See, e.g.,* ***Wiggins v. Smith,*** 539 U.S. 510, 522-23, 123 S.Ct. 2527, 2536-37, 156 L.Ed.2d 471 (2003) (counsel failed to go beyond pre-sentence report and social services records in investigating mitigating evidence, as required by ABA standards); ***Williams v. Taylor,*** 529 U.S. 362, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (counsel did not investigate and present substantial mitigating evidence, as ABA standards prescribe); ***Strickland,*** 466 U.S. at 688. ("Prevailing norms of practice as reflected in American Bar Association standards and the like, *e.g.,* ABA Standards for Criminal Justice 4-1.1 to 4-8.6 (2d ed. 1980) ("The Defense Function"), are guides to determining what is reasonable"). While these standards and their applicability to Quitman were briefed extensively to the trial court, there is no indication that the trial court ever considered them.

¶57.    There are at least three substantial reasons why the trial court should have utilized the ABA Criminal Justice Standards for the Defense Function ("ABA Defense Function Standards") as a benchmark for determining whether Quitman's indigent defense system violates the Mississippi Constitution: (1) the standards represent the legal community's

consensus as to the minimum required of an indigent defense system; (2) this Court and other courts rely on the ABA standards to determine compliance with the constitutional mandate of effective assistance of counsel, and (3) the standards mirror this Court's holdings regarding the minimum requirements of a constitutional indigent defense system. By ignoring the intelligible framework of the ABA standards, the trial court faced a tremendous disadvantage in assessing the constitutionality of Quitman's indigent defense system.

¶58. In addition to the authoritative standards of the ABA, the trial court ignored volumes of credible, unrebutted evidence which was determinative of Quitman's claims. This Court has long held that it is reversible error for a trial court to ignore uncontradicted evidence. *Lucedale Veneer Co. v. Rogers,* 211 Miss. 613, 53 So.2d 69, 75 (1951) ("[E]vidence which is not contradicted by positive testimony or circumstances, and is not inherently improbable, incredible, or unreasonable, cannot be arbitrarily or capriciously discredited, disregarded, or rejected. . . . "); *Tarver v. Lindsey,* 161 Miss. 379, 137 So. 93, 96 (1931) ("Where, as in this case, the testimony of witnesses is undisputed, is reasonable in itself, . . . . and the witnesses are unimpeached, then the trier of facts must act on the testimony and cannot reject it, else trial might eventuate in arbitrary results. . ."); *Holmes v. Holmes,* 154 Miss. 719, 123 So. 865, 866-67 (1929) (reversing lower court's dismissal where trial court ignored both the undisputed testimony of a clerk with direct personal knowledge of the transaction at issue, as well as a letter written by defendant containing important admissions).

¶59. Here, the record contains undisputed expert and lay witness testimony establishing that the county-based system fails to provide the tools of an adequate statewide defense system. Many court-appointed defense attorneys throughout the State do not file pretrial motions, use

32

experts or invest the time necessary to represent their indigent clients effectively. In addition to lacking governmental oversight, these attorneys have no administrative or investigative support to assist in the representation of their clients. The trial court ignored the following evidence:

a. There are a substantial number of instances where neither lawyer nor defendant recognize each other at arraignment, and prisoners remain in jail up to 4 to 5 months without any contact with their attorney.

b. Client meetings are held in groups in the courtroom within earshot of the prosecutor and the judge.

c. Public defenders routinely waive preliminary hearings, accept facts in indictments, and do not ask for investigators or experts.

d. There is no opportunity for the investigation or communication necessary to make an informed decision when pleas are entered on arraignment day.

e. There is a vast disparity between the resources of the State and public defenders.

¶60. Governmental studies have repeatedly found that the tools of an adequate defense are missing in county indigent defense systems. For instances, the Spangenberg studies[2] found that "funding for indigent defense is totally inadequate," "the lack of adequate resources for indigent defense services results in poor quality services and representation," "there is no state wide oversight of indigent defense, which leads to a hodgepodge, county-by-county approach to providing services," and "[e]very aspect of defense representation is compromised."

---

[2] The Spangenberg Group, a nationally known consulting organization with expertise in indigent defense systems, prepared a comprehensive report (in contemplation of the current litigation) on Mississippi's indigent defense systems under the auspices of the Mississippi Bar Association.

Similarly, the Mississippi Public Defenders Task Force report [3] concluded that "indigent defense remained a vexing problem for the counties" and contained deeply troubling reports by several circuit court judges describing systemic inadequacies they have observed in their districts. While this information was available to the trial court, its opinion does not refer to these repeated findings of inadequate representation.

*Need for a Statewide Indigent Defense System*

¶61. The Mississippi Constitution, Article 3, § 26, has been interpreted to create a duty on the part of the state to provide effective assistance of counsel to indigent defendants. *See Quitman I,* 807 So.2d at 406-07. This Court has recognized that this means that indigent defendants must be provided with the tools of an adequate defense. *Harrison v. State,* 635 So.2d 894, 901 (Miss. 1994) (citing *Ake v. Oklahoma,* 470 U.S. 68, 77, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985)). Further, this Court has recognized that these "tools" which are necessary to construct an adequate defense vary depending on the facts and circumstances of each case. *Harrison,* 635 So.2d at 901 (citing *State v. Acosta,* 597 P.2d 1282, 1284 (Or. Ct. App. 1979)). Among these tools which allow defendants to construct an adequate defense is the right to counsel. The Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right to have the assistance of counsel for his defense." The U.S. Supreme Court has construed this to mean that in federal courts counsel must be provided for defendants unable to employ counsel unless the right is competently and intelligently waived. *Gideon v.*

---

[3] The Mississippi Public Defenders Task Force issued its September 29, 2000, report pursuant to a legislative mandate to recommend improvements to the indigent defense systems in criminal proceedings throughout the State of Mississippi.

*Wainwright,* 372 U.S. 335, 339-40, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). In *Gideon,* the Supreme Court recognized the dire importance of the right to counsel and ruled that the Sixth Amendment provides that in all criminal prosecutions that the accused shall enjoy the right to assistance of counsel for his defense, and that this right is made obligatory on the states by the Fourteenth amendment, and indigent defendants in criminal prosecutions in states courts enjoy the same right. *Id.* at 342-44. Because the Supreme Court has deemed the right to counsel for indigents in state prosecutions to be fundamental, the State of Mississippi bears the ultimate responsibility to ensure that this right is preserved. After all, the crime which the defendant is accused of is against the peace and tranquility of the State. The State will shoulder the ultimate financial responsibility of housing the defendant provided that the State is successful in its prosecution. And it will be the state judiciary which will ultimately hear and decide any appeals.

¶62. I am convinced that Quitman County's indigent defense system wholly fails to measure up to legal as well as recognized, authoritative standards. To this end, Quitman's system is in fact delivering constitutionally inadequate assistance of counsel to indigent defendants. The Quitman County indigent defense system fails across the board to safeguard the most fundamental protections necessary for the equitable administration of justice. Mississippi has neglected to ensure that the indigent defense systems in the counties are able to operate independently, that workloads are controlled, that appropriate oversight is in place, and that defendants are allowed confidential access to an attorney who will investigate the facts of each case. The flaws apparent in Quitman's system are not unique. Rather, they are the result of the fundamental problem in a part-time, county-based system that lacks state funding and

35

uniformity. In essence, the State of Mississippi has failed to establish or fund a system of indigent defense that is equipped to provide all defendants with the tools of an adequate defense, and has therefore fallen short of its constitutional obligation. Therefore, I would reverse the trial court's judgment and remand this case to the trial court for further remedial proceedings. For these reasons, I respectfully dissent.

**DICKINSON, J., JOINS THIS OPINION.**